## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MULTIFOLD INTERNATIONAL INCORPORATED PTE. LTD., <br><br> Plaintiff, <br><br> v. <br><br> MOTOROLA MOBILITY LLC, <br><br> Defendant. | C.A. No. 23-1173-JCG |
| MULTIFOLD INTERNATIONAL INCORPORATED PTE. LTD., <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | C.A. No. 23-1323-JCG |

## <u>JOINT CLAIM CONSTRUCTION BRIEF</u>

McCARTER & ENGLISH, LLP
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Maliheh Zare (#7133)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com
mzare@mccarter.com

*Attorneys for Plaintiff Multifold
International Incorporated Pte. Ltd.*

RICHARDS, LAYTON & FINGER, PA
Kelly E. Farnan (#4395)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendant Motorola Mobility
LLC*

Morris, Nichols, Arsht &Tunnell LLP
Brian P. Egan (#6227)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
began@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant Google LLC*

Dated: May 15, 2025

2

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

    A.   Plaintiff's Opening Position .................................................................... 1

    B.   Defendants' Answering Position .............................................................. 2

    C.   Plaintiff's Reply Position ......................................................................... 4

    D.   Defendants' Sur-Reply Position ............................................................... 4

II.   AGREED-UPON CONSTRUCTIONS ............................................................. 5

III.  DISPUTED CONSTRUCTIONS ...................................................................... 6

    A.   DISPUTED TERMS IN MULTIPLE PATENTS-AT-ISSUE ................. 6

        1.   Display ('756, '050, '135, '577, '842, and '494 patents) ................. 6

            a.   Plaintiff's Opening Position ................................................ 6

            b.   Defendants' Answering Position ...................................... 10

            c.   Plaintiff's Reply Position ................................................. 14

            d.   Defendants' Sur-Reply Position ...................................... 17

        2.   "First [screen/display]" and "Second [screen/display]" ('050, '135, '577, '842, '080, and '205 patents) .......................................................... 20

            a.   Plaintiff's Opening Position .............................................. 20

            b.   Defendants' Answering Position ...................................... 23

            c.   Plaintiff's Reply Position ................................................. 29

            d.   Defendants' Sur-Reply Position ...................................... 34

    B.   DISPUTED TERMS FROM THE '842 PATENT ........................................ 36

        1.   Image Capture Mode ............................................................................. 36

            a.   Plaintiff's Opening Position .............................................. 36

i

b.    Defendants' Answering Position ........................................................... 37

c.    Plaintiff's Reply Position ................................................................... 40

d.    Defendants' Sur-Reply Position ......................................................... 41

2.    Providing.............................................................................................. 42

a.    Plaintiff's Opening Position................................................................ 42

b.    Defendants' Answering Position ........................................................ 43

c.    Plaintiff's Reply Position ................................................................... 45

d.    Defendants' Sur-Reply Position ......................................................... 46

C.    DISPUTED TERMS FROM THE '494 PATENT ..................................... 46

1.    Wherein the auxiliary page is a child of the primary page ........................... 46

a.    Plaintiff's Opening Position................................................................ 47

b.    Defendants' Answering Position ........................................................ 48

c.    Plaintiff's Reply Position ................................................................... 51

d.    Defendants' Sur-Reply Position ......................................................... 55

D.    DISPUTED TERMS FROM THE '050 PATENT ..................................... 57

1.    "In Focus" ........................................................................................... 57

a.    Plaintiff's Opening Position................................................................ 57

b.    Defendants' Answering Position ........................................................ 58

c.    Plaintiff's Reply Position ................................................................... 60

d.    Defendants' Sur-Reply Position ......................................................... 61

2.    Configurable area ................................................................................. 62

a.    Plaintiff's Opening Position................................................................ 62

b.    Defendants' Answering Position ........................................................ 64

ME1 53150038v.1

  c.  Plaintiff's Reply Position ................................................................. 68

  d.  Defendants' Sur-Reply Position ..................................................... 70

E.  DISPUTED TERMS FROM THE '135 PATENT ...................................... 71

 1.  Pre-configured annunciator window ...................................................... 71

  a.  Plaintiff's Opening Position ........................................................... 71

  b.  Defendants' Answering Position .................................................... 73

   (i)  Spanning Multiple Screens ....................................................... 73

   (ii)  Status Information ...................................................................... 75

   (iii)  Pre-Configured .......................................................................... 75

  c.  Plaintiff's Reply Position ............................................................... 76

  d.  Defendants' Sur-Reply Position .................................................... 77

 2.  Open state ................................................................................................ 78

  a.  Plaintiff's Opening Position ........................................................... 78

  b.  Defendants' Answering Position .................................................... 79

  c.  Plaintiff's Reply Position ............................................................... 80

  d.  Defendants' Sur-Reply Position .................................................... 81

 3.  Degrade ................................................................................................... 81

  a.  Plaintiff's Opening Position ........................................................... 81

  b.  Defendants' Answering Position .................................................... 83

  c.  Plaintiff's Reply Position ............................................................... 84

  d.  Defendants' Sur-Reply Position .................................................... 84

ME1 53150038v.1

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)..................................................................39

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)..................................................................40

*AstraZeneca AB v. Mylan Pharms. Inc.*,
19 F.4th 1325 (Fed. Cir. 2021) ..................................................................71

*In re Bass*,
314 F.3d 575 (Fed. Cir. 2002)....................................................................78

*Baxalta Inc. v. Genentech, Inc.*,
972 F.3d 1341 (Fed. Cir. 2020)..................................................................61

*Becton, Dickinson & Co. v. Neumodx Molecular, Inc.*,
No. CV 19-1126-LPS, 2021 WL 1854650 (D. Del. May 10, 2021)
..........................................................................................................21, 28, 29

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010).................................................24, 29, 30, 34

*Bicon, Inc. v. Straumann Co.*,
441. F.3d 945, 950 (Fed. Cir. 2006)...........................................................77

*Campbell Soup Co. v. Gamon Plus, Inc.*,
No. 2020-2322, 2021 WL 3671366 (Fed. Cir. Aug. 19, 2021) ...............74

*Carucel Invs. L.P. v. Vidal*,
No. 2021-1731, 2023 WL 8888644 (Fed. Cir. Dec. 26, 2023)..........68, 70

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009)..................................................................55

*F'Real Foods, LLC v. Hamilton Beach Brands*,
2017 WL 5886011 (D. Del. Nov. 29, 2017) .............................43, 44, 45

*F'Real Foods, LLC v. Hamilton Beach Brands, Inc.*,
457 F. Supp. 3d 434 (D. Del. 2020)...........................................................44

*Gaus v. Conair Corp.*,
363 F.3d 1284 (Fed. Cir. 2004)..................................................................34

iv

*Google LLC v. EcoFactor, Inc.*,
  92 F.4th 1049 (Fed. Cir. 2024) .......................................................................10, 21, 23, 28

*GPNE Corp. v. Apple Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016).....................................................................................59, 65

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008)...........................................................................................13

*Harris Corp. v. IXYS Corp.*,
  114 F.3d 1149 (Fed. Cir. 1997).....................................................................................39, 55

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
  822 F.3d 1312 (Fed. Cir. 2016)...........................................................................................67

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
  690 F.3d 1318 (Fed. Cir. 2012)...........................................................................................79

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
  383 F.3d 1295 (Fed. Cir. 2004)...........................................................................................70

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999).............................................................................................43

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
  177 F.3d 968 (Fed. Cir. 1999).............................................................................................62

*Koninklijke Philips N.V. v. Wangs All. Corp.*,
  2017 WL 6329616 (D. Mass. Dec. 11, 2017)........................................................27, 56, 65

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004).........................................................................................8, 57

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
  814 F.3d 1343 (Fed. Cir. 2016)...........................................................................................74

*Mangosoft, Inc. v. Oracle Corp.*,
  525 F.3d 1327 (Fed. Cir. 2008)......................................................................48, 49, 50, 52

*MasterMine Software, Inc. v. Microsoft Corp.*,
  874 F.3d 1307 (Fed. Cir. 2017).....................................................................................29, 71

*Meds. Co. v. Mylan, Inc.*,
  853 F.3d 1296 (Fed. Cir. 2017).....................................................................................51, 57

*Meyer Intel. Properties Ltd. v. Bodum, Inc.*,
  690 F.3d 1354 (Fed. Cir. 2012)......................................................................42, 44, 45, 46

v

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004)............................................................66, 67, 69, 70

*MPHJ Tech. Invs., LLC v. Ricoh Ams. Corp.*,
  847 F.3d 1363 (Fed. Cir. 2017)..........................................................................54

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
  415 F.3d 1335 (Fed. Cir. 2005)..........................................................................50

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)....................................................................11, 80

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)..........................................................................13

*Primos, Inc. v. Hunter's Specialties, Inc.*,
  451 F.3d 841 (Fed. Cir. 2006)............................................................................56

*Prism Techs. LLC v. Verisign, Inc.*,
  512 F.Supp.2d 174 (D. Del. 2007)................................................................15, 18

*Rambus Inc. v. Infineon Techs. Ag*,
  318 F.3d 1081 (Fed. Cir. 2003)..........................................................................76

*Regeneron Pharms., Inc. v. Mylan Pharms., Inc.*,
  130 F.4th 1372 (Fed. Cir. 2025) ...................................................................25, 34

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
  717 F.3d 929 (Fed. Cir. 2013)......................................................................24, 30

*Sanofi v. Glenmark Pharms. Inc., USA*,
  204 F.Supp.3d 665 (D. Del. 2016, *aff'd sub nom. Sanofi v. Watson Lab'ys
  Inc.*, 875 F.3d 636 (Fed. Cir. 2017)) ................................................................70

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
  8 F.4th 1285 (Fed. Cir. 2023) ............................................................................83

*Shire Development LLC v. Teva Pharms. USA, Inc.*,
  No. 1:17-cv-01696-RGA, 2019 WL 969638 (D. Del. Feb. 28, 2019)......................8

*Thorner v. Sony Comput. Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)................................................................60, 68, 80

*Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016)....................................................................4, 5, 70

*Uniloc 2017 LLC v. Google LLC*,
  2020 WL 512605 (E.D. Tex. Jan. 30, 2020)........................................................29

*Ventana Med. Sys., Inc. v. Biogenix Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006)..................................................................................64, 67

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)..........................................................................................74

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)...............................................................................................................56

**Other Authorities**

Fifth Edition of the Microsoft Computer Dictionary ...................................................................50

New Oxford American Dictionary 1406 (3rd ed. 2010) ..............................................................43

ME1 53150038v.1

## I.    INTRODUCTION

### A.  Plaintiff's Opening Position

Multifold International Incorporated Pte. Ltd. ("Multifold") is the successor in interest to Flextronics International Ltd. ("Flextronics").  Flextronics launched the Imerj project in 2009 and became a pioneer in the foldable smartphone industry.  The Imerj prototypes were widely praised and received positive press.  And further, Flextronics was awarded dozens of patents on the unique innovations necessary to make this advanced technology work and satisfy users' needs regarding hardware, software, and the user interface experience.  (D.I. 1 at ¶¶ 58-62.) Eight of those patents are asserted here.

The Asserted Patents describe and claim novel inventions that improve the usability and versatility of smartphones that fold and use multiple displays.  Because the phone folds, the user can enjoy a larger screen in a smaller form factor.  And the novel user interface technology enabled new uses and designs of various applications to better utilize the greater screen space:



(Ex. 2 at Figs. 6F, 6I and 6J.)

Each patent claims a specific improvement that benefits phones that fold or incorporate multiple displays.  Six of the eight Asserted Patents overlap in inventors and specifications (*e.g.*, the first seven figures of each patent and corresponding descriptions are largely the same.) As explained further below, the '842 patent improves a user interface for image-capture (camera)

1

features.  The '756 patent is directed to methods for revealing a combination of desktops on single or multiple displays that can be selectively displayed, shifted, and hidden between screens by user gestures.  The '135 patent is directed to an improved "annunciator" display or window that can span across a device with multiple displays.  The '577 patent is for an improved "universal clipboard application" advantageously designed for a multi-screen user device.  And the '494 patent is directed to minimizing and maximizing displayed output associated with applications.

The remaining two patents (the '080 patent and its continuation, the '205 patent) are also directed to user-interface improvements for multi-display/screen smartphones, but these patents have different inventors and, as explained below, these patents at times use different terminology to express similar concepts as those disclosed in the other patents.  The '080 and '205 patents relate to using certain icon functionality to improve how application status is presented to a user.

Google's and Motorola's (Defendants') smartphones infringe the eight asserted patents. However, in an effort to manufacture an infringement defense where none exists, Defendants have proposed constructions that are improperly narrow and in violation of multiple claim construction canons.  For example, Defendants ignore established case law regarding standard claim language in an attempt to render it indefinite, seek to narrow terms by inserting language limiting claims to preferred embodiments, and insert limitations to read out other disclosed embodiments.  Those proposals should be rejected, and Multifold's proposals—which are consistent with the intrinsic record and the plain meaning of the claim terms—should be adopted by the Court.

### B.  Defendants' Answering Position

The Asserted Patents involve various features of a specific device: a folding phone with **two separate** internal screens, as depicted in the figures that Multifold itself reproduces in its Introduction.  The Accused Products, by contrast, either feature a **single** internal screen or are simply "flat," non-foldable phones.  The supposed "unique innovations" Multifold touts as

2

enabling the 2009 two-screen Imerj phone—which was a commercial failure—are not needed or used by Motorola's and Google's modern phones.  In straining to manufacture an infringement case where none exists, Multifold mischaracterizes the claim language, ignores the unambiguous definitions and disclosures in the specifications, and contravenes positions taken during prosecution to obtain the patents.

For example, the asserted claims of the '050, '135, '577, and '842 patents recite a "first screen" and "second screen" and define a "screen" as a "physical structure."  Similarly, the asserted claims of the '080 and '205 patents recite a "first display" and "second display" and define "display" as "physical hardware."  Consistent with the intrinsic evidence and binding Federal Circuit precedent, Defendants propose that the Court construe these "screens" and "displays" as "separate and distinct" structures.  Multifold cannot overcome the legal presumption that the two screens/displays are separate and distinct structures.  Instead, Multifold misinterprets the specifications to argue that a single screen in Defendants' products is both the "first screen" and the "second screen."  Multifold's position is legally and logically unfounded.

The remaining claim construction disputes are similar.  As to the "display" term in the '756, '050, '135, '577, '842, and '494 patents, the "in focus" term in the '050 patent, and the "pre-configured annunciator window" and "open state" terms in the '135 patent, Defendants have proposed constructions that are taken directly from definitional language in the specifications and are consistent with every embodiment and disclosure in the patents.  Multifold misreads the specifications to fabricate disputes where none should exist.

As for the "image capture mode" and "providing" terms in the '842 patent and the "child" term in the '494 patent, Defendants propose clarifying constructions to aid the jury that are based on the claim language and embodiments.  Multifold's proposals cannot be squared with the plain

language of the claims or the specifications.  And Defendants' proposals for the "configurable area" term in the '050 patent and the "degrade" term in the '135 patent are consistent with the undisputed disclosures in the patents and taken from statements that the Applicant made to the Patent Office.  Multifold's positions mischaracterize the prosecution history and flout bedrock patent law forbidding claims from being construed one way to obtain their allowance and a different way against accused infringers.

For the reasons below, the Court should adopt Defendants' construction of each term.

### C.  Plaintiff's Reply Position

In order for a claim term to be construed in a way that is contrary to its plain meaning, a patentee must either clearly set forth a definition for that term or express a clear disavowal of claim scope.  Defendants ignore this exacting standard and instead attempt to improperly import into the claims all sorts of additional limitations by relying on exemplary preferred (but not required) embodiments in the specifications, permissive statements about what the claimed inventions can (but not must) do, inapposite prosecution history arguments related to unasserted patents with different claim limitations, extrinsic evidence that contradicts the intrinsic record and therefore cannot be credited, and conclusory expert testimony.  Defendants' arguments violate multiple claim construction canons and fail to justify their unduly narrow constructions.  Multifold respectfully requests the Court adopt Multifold's plain meaning constructions.

### D.  Defendants' Sur-Reply Position

Claim terms must be construed "in the context of the patent" and prosecution history.  *Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016).  Defendants' constructions do just that, applying settled Federal Circuit law invoked by the claim language (e.g., "first" and "second" screen/display); adopting the ordinary meaning in the art, which is consistent with the intrinsic record (e.g., "child"); and crediting express definitions in the

4

specification and prosecution history (e.g., "display").  Unable to find support in the intrinsic evidence for its proposals, Multifold's reply position repeatedly mischaracterizes Defendants' arguments as rooted in doctrines disclaiming the plain meaning of terms.  *Supra* at 4.  Precedent forecloses Multifold's argument:  Federal Circuit "case law does not require explicit redefinition or disavowal" for the intrinsic record to inform claim construction.  *Symantec*, 811 F.3d at 1363.

## II.     AGREED-UPON CONSTRUCTIONS

The parties have agreed that the following terms should be construed as follows.  *See* C.A. No. 23-1173-JCG, D.I. 83; C.A. No. 23-1323-JCG, D.I. 78 (Joint Claim Construction Chart).

| Term | Claims | Agreed Upon Construction |
|---|---|---|
| Screen | 080: 12<br>205: 15, 19 | "displayed image produced on the display" |
| Display | 080: 12<br>205: 15, 19 | "physical hardware that is operable to render a screen" |
| Screen | 050: 17<br>135: 3<br>577: 17<br>842: 1, 11 | "a physical structure that includes one or more hardware components that provide the device with the ability to render a user interface and/or receive user input" |

5

## III.    DISPUTED CONSTRUCTIONS

### A.  DISPUTED TERMS IN MULTIPLE PATENTS-AT-ISSUE

#### 1.    Display ('756, '050, '135, '577, '842, and '494 patents)

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 1. | Display | 756: 7<br>050: 17<br>135: 3, 6<br>577: 17<br>842: 1, 11<br>494: 1 | "a portion of one or more screens used to display the output of a computer to a user" | "a portion of one or more screens used to display the output of a computer to a user, where multiple displays that are part of a single physical screen are managed as separate logical displays."<br><br>In the alternative, indefinite. |

#### a.  Plaintiff's Opening Position

"Display" is defined in the '756, '050, '135, '577, '842, and '494 patents as "a portion of one or more screens used to display the output of a computer to a user." *See, e.g.*, Ex. 8 at 4:22-23.[1] The parties agree that this statement—which is Multifold's proposed construction—should be included in the construction of "display." This construction is also consistent with the term's plain and ordinary meaning (*see* Ex. 16 at ¶¶ 70-72) and is consistent with how the term is used throughout the intrinsic record.  As one example, in claim 17 of the '050 patent, the claimed device requires "a first touch sensitive display . . . of a first screen" and "a second touch sensitive display . . . of a second screen." Ex. 5 at Cl. 17. The claim further requires displaying a first image of a first application and a second image of a second application on the first and second touch sensitive

---

[1] *See also* Ex. 2 at 5:1-2; Ex. 5 at 3:65-66; Ex. 6 at 4:43-44, Ex. 7 at 3:31-32, Ex. 1 at 3:28-29.

displays.  *Id.* Here, a "display" refers to a portion of a screen that has the output displayed to a user.  Neither this exemplary claim, nor any other, contemplates a narrower definition of "display" that departs from the plain meaning definition in the specification.[2] *See, e.g.*, Ex. 16 at ¶¶ 72-73.

Defendants' construction wrongly adds to this plain meaning and definitional statement an additional requirement—"where multiple displays that are part of a single physical screen are managed as separate logical displays." But the specification explains that this is merely one option: "[a] single physical screen can include multiple displays that are managed as separate logical displays." Ex. 8 at 4:27-28. It is not necessary to insert one possible embodiment from one possible context into the construction of the broader term—the blue sentence below is the definition that both parties agree should be included, and the red text is Defendants' proposed addition:

> The term "display" refers to a portion of one or more screens used to display the output of a computer to a user.  A display may be a single-screen display or a multi-screen display, referred to as a composite display.  A composite display can encompass the touch sensitive display of one or more screens.  A single physical screen can include multiple displays that are managed as separate logical displays.  Thus, different content can be displayed on the separate displays although part of the same physical screen.

Ex. 8 at 4:22-30. As shown above, after defining the term display (in blue), the remainder of the paragraph provides non-limiting examples of how displays and screens can be configured.  *See also* Ex. 16 at ¶¶ 82-85. Defendants' construction cherry-picks one of those non-limiting permissive examples, re-writes it to be a requirement of the claim, and excludes the others.  At a minimum, if the Court does not adopt Multifold's construction, Multifold proposes in the

---

[2] The remainder of the intrinsic record is similar.  For example, Fig. 1A of the '494 patent is an example embodiment of a dual-touch-screen device.  This figure and its corresponding disclosure appears in each of the Asserted Patents at issue for this disputed term.  Each touch sensitive screen 104 and 108 has a touch sensitive display 110 and 114, "which, in addition to being touch sensitive, also displays information to a user"—confirming that a display is a part of the screen used to display content to a user.  *See, e.g.*, Ex. 8 at 8:64-9:3; Ex. 16 at ¶¶ 74-78.

alternative that the Court adopt the entire paragraph shown above, which is included in each specification of the Asserted Patents at issue for this claim term, as the construction of "display." *See Shire Development LLC v. Teva Pharms. USA, Inc.*, No. 1:17-cv-01696-RGA, 2019 WL 969638, at *9-11 (D. Del. Feb. 28, 2019) (adopting an entire paragraph from the specification reciting several non-limiting terms as the court's construction, and declining to find the term indefinite.)

Defendants' elevation of an exemplary embodiment into the construction of "display" is problematic and unwarranted for several reasons.  First, it is unhelpful to the trier of fact.  As described above, Defendants' proposal seeks to make mandatory a permissive example of how multiple displays arranged on **one** screen can be configured.  But, many of the asserted claims explicitly require **two** screens, and several explicitly require the claimed first and second displays to be located on the claimed first and second screens.  *See*, *e.g.*, Ex. 5 at Cl. 17 (requiring "a first touch sensitive display . . . of a first screen" and "a second touch sensitive display . . . of a second screen"); *see also* Ex. 6 at Cl. 3, 9; Ex. 7 at Cl. 17; Ex. 1 at Cl. 1, 11; Ex. 16 at ¶¶ 79-81. In these scenarios, Defendants' proposed construction would be irrelevant to the claims and defenses at issue in this case, by seeking to read in an embodiment unrelated to the claims.  Consequently, it would be unhelpful and confusing to the trier of fact, and should be rejected on this basis.

Defendants' construction is also improper because the red sentence above, forming the basis for Defendants' proposed addition, does not define what a "display" is.  It is instead a permissive example of how one screen and multiple displays "***can***" be configured in a situation where there are multiple displays on one screen.[3] Defendants' proposal improperly distorts that

---

[3] Including this as part of the construction improperly reads a limitation from an embodiment of the specification into the claims.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

permissive example into the only allowable configuration of multiple displays on one screen (with each display managed as separate logical displays).  In doing so, Defendants' construction is at odds with other disclosures in the specification.  *See* Ex. 16 at ¶¶ 85-86. For example, in describing Figure 1A, the specifications explain that "[i]n other embodiments, screens 104 and 108 may include more than one display area." *See, e.g.*, Ex. 8 at 9:1-3. Notably, the patents do not state that each such display area must be managed as separate logical displays.  That makes sense because the patents also disclose that "[o]ne or more display controllers 216a, 216b may be provided for controlling the operation of the touch sensitive screens 104 and 108, including input (touch sensing) and output (display) functions." *Id.* at 12:45-48.  If each screen can include more than one display, and a single display controller can provide for controlling the display functions of that screen, it follows that multiple displays that are part of a single physical screen need not be managed as separate logical displays—embodiments which are improperly excluded under Defendants' proposed construction.  *See also* Ex. 16 at ¶ 86.

Notably, several months before exchanging *Markman* terms in this case, Defendants filed IPRs on several of the asserted patents.  There, Defendants and their experts, Dr. Chatterjee and Dr. Rodriguez, interpreted "display" exactly as Multifold seeks to construe the term here.  *See, e.g.*, Ex. 17 at ¶ 51, n. 4; Ex. 18 at ¶ 47. Defendants have offered no explanation why the same construction they endorsed before the PTAB would be improper here, or otherwise indefinite.

Nonetheless, Defendants have alleged—without explanation—that unless Defendants' construction (with its additional requirements) is adopted here, the term "display" is indefinite. This argument directly contradicts their own IPRs and their own experts' analyses.  Because Defendants' position is contrary to the intrinsic record, in violation of claim construction canons,

and is directly contradicted by their own experts, it should be rejected, the term should be found to be definite, and Plaintiff's construction should be adopted.  *See also* Ex. 16 at ¶ 88.

### b.  Defendants' Answering Position

The '756, '050, '135, '577, '842, and '494 patents define "display" as follows:

> The term "display" refers to a portion of one or more screens used to display the output of a computer to a user.  A display may be a single-screen display or a multi-screen display, referred to as a composite display.  A composite display can encompass the touch sensitive display of one or more screens.  A single physical screen can include multiple displays that are managed as separate logical displays.  Thus, different content can be displayed on the separate displays although part of the same physical screen.

*E.g.*, Ex. 2 at 5:1-9.  The same language appears in all six patents.  There is no dispute that this paragraph is definitional.  *Supra* at 7-8.  The only disagreement is whether the claims require "multiple displays that are part of a single physical screen" to be "managed as separate logical displays."  *Google*, D.I. 78, Ex. B at 1; *Motorola*, D.I. 83, Ex. B at 1.  The specification unequivocally confirms that they must.

That conclusion follows from the definition itself.  The first sentence explains what the term "display" refers to, and the subsequent sentences enumerate the relationships between physical screens and displays.  The specification identifies two types of displays: a "multi-screen display" and a "single-screen display."  *E.g.*, Ex. 2 at 5:2-4.  A multi-screen display "can encompass the touch sensitive display of one or more screens."  *Id.* at 5:4-6.  For single-screen displays, two scenarios are described: (1) there may be a single display per screen—a scenario contemplated in many of the claims at issue, as Multifold observes, *supra* at 8; or (2) "[a] single physical screen can include multiple displays," Ex. 2 at 5:6-7.  In the latter scenario, the multiple displays "are managed as separate logical displays," such that "different content can be displayed on the separate displays although part of the same physical screen."  *Id.* at 5:6-9.

10

The only permissive elements of this definitional paragraph—the uses of "may" and "can"—pertain to whether a display spans one or more screens, or whether a screen includes multiple displays. However, when discussing the characteristics of each of these configurations, the language is mandatory. Specifically, although the specifications state permissively that a "single physical screen *can* include multiple displays," they mandate that such displays "*are* managed as separate logical displays." *Id.* at 5:6-7 (emphasis added). The paragraph says that this management is mandatory, not just that they *may be* so managed. Nothing indicates that this aspect is "non-limiting," as Multifold urges. *Supra* at 7-8.[4]

The remainder of the specifications confirms that conclusion by outlining a hierarchy of "windows," "displays," and "screens," each of which has a different meaning. Each patent defines a "window" as a "typically rectangular[] displayed image on at least part of a display that contains or provides content different from the rest of the screen." Ex. 2 at 6:23-26. Thus, each window is shown on "a display," which as discussed above forms "a portion of one or more screens." *Id.* at 5:1-2, 6:23-25. In keeping with this hierarchy, the specifications explain:

> A series of active and/or non-active windows (or other display objects, such as, a desktop display) can be associated with each display. An active window (or other display object) is currently displayed. A non-active windows [*sic*] (or other display objects) were opened and, at some time, displayed but are now not displayed.

*Id.* at 19:49-54; *see also id.* at 19:63-65 (discussing "the windows … that are active or not active on each of the displays"); *id.* at 20:63-66 (explaining that each "window typically fills a display … but may be smaller than the display … and float on top of other windows"); *id.*, fig. 7A. As

---

[4] Multifold questions Defendants for selecting this one sentence in the definitional paragraph for inclusion in their construction, but the reason Defendants have done so is that it directly relates to the infringement allegations in this case and therefore will be helpful to resolving the disputed issues. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). If the Court instead wishes to include the entire definitional paragraph in the construction, Defendants would not object to that approach.

11

explained by Dr. Cliff Forlines, who has over 20 years of experience developing touch user interfaces, a person of ordinary skill in the art ("POSITA") would have understood that these disclosures comport with the definitional statement. Specifically, they make explicit that each display is associated with zero or more windows or other display objects. *See* Ex. 31, Declaration of Clifton Forlines, Ph.D. ("Forlines Decl."), ¶¶ 29-30. By contrast, under Multifold's proposal, nothing distinguishes a "display" from a "window."

Multifold identifies no intrinsic evidence inconsistent with Defendants' construction. *Supra* at 9. Multifold first cites the statement that "screens 104 and 108 may include more than one display area," Ex. 8 at 9:1-3; Ex. 2 at 8:60-62, which is entirely consistent with Defendants' construction. Nothing indicates that the two display areas in this example are not managed as separate logical displays, and the patents had no need to reiterate what the definitional sections already specified. Multifold also argues that if a screen can include multiple displays and a single controller can manage that screen, then those displays need not be managed as separate logical displays. Neither Multifold nor its expert explains that logical leap. In reality, a POSITA would understand that one display controller could control multiple logical displays. Forlines Decl. ¶¶ 38-39. The patent itself makes this apparent. The paragraph Multifold cites notes that "a common or shared touch screen controller … may be used to control each of the [two] included touch sensitive screens," and that "the functions of a touch screen controller … may be incorporated into other components, such as a processor." Ex. 8 at 12:50-56; Ex. 2 at 12:42-48. If a single display controller can control multiple screens, it also could control multiple logical displays. Forlines Decl. ¶¶ 39, 46, 55.[5]

---

[5] Contrary to Multifold's argument, Defendants' proposed construction is neither irrelevant nor confusing even though some (though not all) claims explicitly require two screens. A single screen

Multifold also claims inaccurately that, in IPR proceedings for the '756 and '494 patents, Defendants and their experts interpreted "display" as Multifold seeks to define it now. *Supra* at 9. Multifold cherry-picks excerpts where the "separate logical displays" aspect was not mentioned because it was not relevant. Defendants' IPR petition for the '756 patent consistently referenced this requirement, including it as part of the definition of the term "display." *See* Ex. 22 at 21-22 (quoting the entire definitional paragraph as the "definition for 'display'" and emphasizing the "separate logical displays" language). Defendants' IPR for the '494 patent did not address multiple displays on a single screen because there was no need to do so—each mapped "display" corresponded directly to one of the two screens in the prior art reference, as noted in the footnote Multifold cites. Ex. 17 at ¶ 51 n.4. Thus, Defendants have consistently maintained the same construction, applying the "separate logical displays" requirement whenever it was relevant.

Defendants' construction also saves the claims from indefiniteness. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1335 n.6 (Fed. Cir. 2003) ("courts should attempt to construe claims to preserve their validity"). If the Court were to adopt Multifold's construction of "display" without requiring that "multiple displays that are part of a single physical screen are managed as separate logical displays," a POSITA would lack reasonable certainty about the term's boundaries. "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008). That is precisely the problem with Multifold's proposal. Forlines Decl. ¶¶ 41-42.

---

on a multi-screen device could have more than one display; in fact, the patent describes such embodiments. Ex. 2 at 8:47-62 (referring to the multi-screen device 100 of figs. 1A-1J, "screens 104 and 108 may include more than one display area."). In that case, each display on a single screen must be managed as a separate logical display for the reasons explained here.

13

Under Multifold's interpretation, "display" could refer to any screen portion of any size or usage, leaving a POSITA uncertain about how to practice or avoid the patent.  For example, '756 patent claim 7 recites a "multi-display device" with at least a "first display" and a "second display."  Ex. 2, cl. 7.  If "display" were defined merely as "a portion of one or more screens used to display the output of a computer to a user," a POSITA would not know what portion of a device's screen arbitrarily constituted a "display" or whether the device has one, two, or any number of "displays."  Forlines Decl. ¶ 41.  The "display" must be something different from a "window," which the specification defines as a separate and distinct concept.  Nor is "display" synonymous with "screen," another distinct concept: notably, Multifold asserts claim 7 of the '756 patent against *non-foldable* phones that unquestionably only have one physical screen.  Ex. 23, '756 Patent Infr. Cont. (Google), at 18-24.  The same indefiniteness flaw would doom the other asserted claims reciting "display."  Forlines Decl. ¶ 41; *e.g.*, Ex. 2, cl. 7.  The *only* reasonably certain boundary for "display" defines it as the patent does: a device's "screen" can have multiple "displays" which are managed as separate logical displays.  Thus, the Court should adopt Defendants' construction of the "display" term.

### c.  Plaintiff's Reply Position

The patents expressly define display: "The term 'display' refers to a portion of one or more screens used to display the output of a computer to a user." *E.g.*, Ex. 8 at 4:22-23. This is precisely Multifold's proposed construction, and Defendants even admit that this sentence "explains what the term 'display' refers to." *Supra* at 10. Further, Defendants' expert, Dr. Forlines, admitted as much at his deposition:

Q.    Is the claim term "display" referring to hardware or software?

A.    The claim term "display" is referring to a portion or one or more of the physical screens.

14

Q.    That's what the claim term "display" means?

A.    I'm reading from the patent's definition: The term 'display' refers to a portion of one or more screens used to display the output of a computer to a user, portion of a physical screen.

Ex. 21 at 59:5-17. These facts end the inquiry—Multifold's proposal is proper.

Defendants' proposed construction, in contrast, improperly rewrites the patents' express definition to make mandatory what is taught as permissive.  Following the express definition of display, the specification provides a number of permissive examples of different types of displays, and how displays and screens can be arranged with respect to one another.  *E.g.*, Ex. 8 at 4:23-30. According to Defendants, "[these] subsequent sentences enumerate the relationships between physical screens and displays." *Supra* at 10. But descriptions of how certain types of screens and displays may or may not be related should not govern the construction of the claim term "display." *Prism Techs. LLC v. Verisign, Inc.*, 512 F.Supp.2d 174, 184 (D. Del. 2007) (construing the term 'untrusted network' according to only the first sentence of a definitional paragraph because "the second sentence explains how an untrusted network acts upon a client-server application, while the first sentence contains the patentee's definition of the term.").

Ignoring other examples contained within the pertinent paragraph, the permissive example Defendants focus upon simply states that "[a] single physical screen ***can*** include multiple displays that are managed as separate logical displays." Ex. 8 at 4:27-28. Nothing in the specification ***requires*** multiple displays on a single physical screen to always be managed as separate logical displays. *Supra* at 10-11.  Defendants' construction essentially rewrites the permissive example in the definitional paragraph into a restrictive mandate unsupported by the record, requiring that "[a] single physical screen can <span style="color:red">only</span> include multiple displays <span style="color:red">if those displays</span> <span style="color:red;text-decoration:line-through">that</span> are managed as separate logical displays." (red font indicating Defendants' edits to the specification's actual language).  That is not how the intrinsic record defines or uses the term "display." Ex. 20 at ¶ 33.

Defendants' focus on outlining an alleged hierarchy between "windows," "displays," and "screens" (*supra* at 11-12) is largely a red herring. For example, the term "window" is not used in the asserted claims (except for the "annunciator window" in the '135 patent) and therefore, the relationship between a "display" and a "window" is not relevant to an infringement, invalidity, or an indefiniteness inquiry. Similarly, as Defendants agree and as Multifold has explained, many of the asserted claims at issue in this case require two separate screens, with one display on each screen. *Supra* at 7-8. Thus, for these claims, any specific hierarchy between multiple displays on one screen is not relevant to the infringement or validity (or indefiniteness) question as well.[6]

In any event, contrary to Defendants' assertion (*supra* at 11-12), Multifold's proposed construction of display is consistent with the intrinsic record's description of screens, displays, and windows and does not render the term indefinite.[7] As Multifold has noted (*infra* at 20), the parties agree that the term "screen" means "a physical structure that includes one or more hardware components that provide the device with the ability to render a user interface and/or receive user input." The patents define "display" as "a portion of one or more screens used to display the output of a computer to a user." And "window" is defined in the specification as "a, typically rectangular, displayed image on at least part of a display that contains or provides content different from the

---

[6] Further belying Defendants' assertion that the specification's example of how multiple displays on a single screen can be managed "directly relates to the infringement allegations" in this case (*supra* at 11 n.4), Defendants elsewhere admit that the "separate logical displays" requirement of Defendants' proposed construction was not relevant to the validity issues raised in Defendants' IPR for the '494 Patent. *Supra* at 13. Defendants cannot have it both ways.

[7] Defendants' assertion that portions of the specification that describe multiple displays on a single screen, but do not refer to those displays as being managed as separate logical displays, nonetheless supports that Defendants' construction is confusing. *Supra* at 11-12. As is Defendants' assertion that just because a POSITA would understand that "one display controller **could** control multiple logical displays" (e.g., when each display is in its own screen), it must necessarily manage multiple displays within a single screen as separate logical displays. *Supra* at 12-13 (emphasis added). Ex. 20 at ¶¶ 38-39.

16

rest of the screen." Thus, the window's displayed image is an example of "an output of a computer to a user" that can be displayed on a display. Ex. 20 at ¶ 34. That, in certain example embodiments, "a series of active and/or non-active windows . . . can be associated with each display" does not change the definition of either a display or a window. Similarly, just because "window[s] typically fill a display . . . but [other windows] may be smaller than the display . . . and float on top of other windows," that does not change the definitions of either a display or a window. Ex. 20 at ¶ 35.

As noted above, Defendants' indefiniteness concerns largely relate to tangential issues unrelated to the scope of the asserted claims. Nevertheless, the clear definitions of screen, display, and window discussed above resolve Defendants' concerns. *Supra* at 13-14; *see also* Ex. 20 at ¶¶ 41-42. Further belying Defendants' indefiniteness argument, even Dr. Forlines admits that "expert testimony is not required to understand the express definition [of display] in the patent." Ex. 31 at ¶ 31.

### d. Defendants' Sur-Reply Position

These patents each include the same paragraph defining the term "display." Defendants' proposal gives effect to the entire paragraph, which requires that multiple displays that are part of a single physical screen "are managed as separate logical displays." Ex. 2 at 5:6-7. Not only does Multifold exclude the patent's definitional language explaining how multiple displays of a single screen are configured, which is a contested claim construction issue in light of Multifold's Infringement Contentions, but its proposal also would render the term indefinite.

At the outset, Multifold cannot keep straight whether the paragraph in question is definitional. Multifold itself argued in its opening brief that the Court could "adopt the entire paragraph … as the construction of 'display.'" *Supra* at 7-8. In a complete reversal, Multifold now asserts that only the first sentence of the paragraph constitutes the "express definition of display," while the rest of the paragraph only describes possible embodiments. *Supra* at 15.

17

Multifold was right the first time. The paragraph appears in a portion of the specification defining multiple terms, separate from the exemplary embodiments. That fact alone distinguishes this case from *Prism Techs.*, 512 F. Supp. 2d at 184, which considered a single sentence in the middle of a descriptive paragraph. Multifold agrees that other paragraphs in this section are definitional beyond their first sentences. *See, e.g.*, D.I. 78 at 13 (arguing that "desktop" is not defined by the first sentence of the definitional paragraph, Ex. 2 at 4:28-29, but the following sentence). The definitional paragraph for "display" is no different.

The plain text of the paragraph states that a "single physical screen ***can*** include multiple displays," but when a single screen has multiple displays, such displays "***are*** managed as separate logical displays." *Id.* at 5:6-7 (emphasis added); *supra* at 10-11.[8] As Dr. Forlines has explained repeatedly, Multifold's proposal "fails to include a required element listed later in the same paragraph." *E.g.*, Ex. 21 at 32:13-34:8; *see also id.* at 46:18-47:7, 61:5-62:14; Forlines Decl., ¶ 29. Multifold misleadingly takes one statement by Dr. Forlines out of context to suggest he agreed that only the first sentence defined the term "display." *Supra* at 14-15. But Multifold notably omits the context of this testimony: its counsel was asking whether a "display" is hardware or software, and that first sentence shows that it is hardware. Ex. 21 at 58:20-59:9. That is why Dr. Forlines only read the first sentence of the paragraph in answering counsel's question.

The remainder of the specifications reinforces the mandatory nature of the "separate logical displays" requirement. *Supra* at 11-12. Tellingly, Multifold can find no disclosure anywhere in the patents suggesting that multiple displays on a single screen can be anything other than separate

---

[8] It is irrelevant that the art in certain IPRs does not implicate this requirement. *Supra* at 16 n.6.

logical displays.  Nor could its expert identify any "example in the patent where multiple displays" on a single screen "are managed as *single* logical displays," when asked.  Ex. 32 at 63:18-65:14.[9]

Multifold's interpretation of "display" is so amorphous that, as its expert conceded, even a "single pixel on a screen"—any pixel—can satisfy it.  Ex. 32 at 63:5-17.  He further testified that Multifold's definition of "display" "depend[s] on the configuration of the computer," *id.* at 59:9-20, and that a "display" ceases to be one when the user turns off the device, *id.* at 136:15-25.  If this is what the claims mean by "display," the public would be deprived of any notice about whether they were practicing the asserted patents, because a POSITA would have no way to know whether a device had one, two, or any number of "displays."  These positions have no support in the patents, highlight the ambiguity of Multifold's definition, and underscore why Multifold's construction would render the claims indefinite if adopted.  *Supra* at 13-14.

---

[9] It is true but irrelevant that most of the claims do not recite a "window," *supra* at 16, or that Multifold's proposed construction of "display" is not identical to the patents' definition of "window," *supra* at 16-17.  The point is that the patents lay out a hierarchy in which windows and displays are different concepts.  *Supra* at 11-12.  Under Multifold's construction, a window can itself be a display, confusingly blurring two terms that the patents define separately.

19

2. **"First [screen/display]" and "Second [screen/display]" ('050, '135, '577, '842, '080, and '205 patents)**

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 19. / 20. | "first [screen/display]" and "second [screen/display]" | 050: 17, 20<br>135: 3, 9<br>577: 17, 18, 20<br>842: 1, 11<br>080: 12<br>205: 15, 19 | Plain and Ordinary Meaning.<br><br>No separate construction necessary in view of constructions of "screen" and "display." "First" and "second" simply identify that the claims include two screens/displays, without adding any special limitations regarding the physical relationship between the screens/displays. | Each "screen" is a "a physical structure that includes one or more hardware components that provide the device with the ability to render a user interface and/or receive user input," and each "display" is "physical hardware that is operable to render a screen." The "first [screen/display]" and "second [screen/display]" are two separate and distinct components. |

a. **Plaintiff's Opening Position**

The parties agree that with respect to the '050, '135, '577, and '842 patents, a "screen" is "a physical structure that includes one or more hardware components that provide the device with the ability to render a user interface and/or receive user input." The parties also agree that in the '080 and '205 patents, where the terminology is different, the analogous term "display" is "physical hardware that is operable to render a screen." The parties disagree about whether claims reciting a "first" and "second" screen/display require two screens/displays that are entirely separate and distinct structures (Defendants' position) or if the screens/displays can, for example, share some common or overlapping components, so long as the screens/displays are performing their respectively recited functions (Multifold's position).

20

The Federal Circuit has stated that listing separate claim limitations "may indicate separate and distinct physical structure, but that presumption may always be rebutted in the context of a particular patent." *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1058 (Fed. Cir. 2024) (finding that a claim limitation listing five separate inputs did not require that the inputs be entirely separate and distinct). *Linear Technology Corp. v. ITC* is particularly on point. *See* 566 F.3d 1049 (Fed. Cir. 2009). There, the at-issue claim required a "second circuit" and a "third circuit." *Id.* at 1054-55. An ITC Administrative Law Judge construed the terms to require separate and distinct elements. *See id.* at 1055. The Federal Circuit disagreed in light of the remainder of the evidence, holding "there is nothing in the claim language or specification that supports narrowly construing the terms to require a specific structural requirement or entirely distinct 'second' and 'third' circuits. Rather, the 'second' and 'third' circuits must only perform their stated function." *Id.*

Judge Stark reached a similar conclusion in *Becton, Dickinson & Co. v. Neumodx Molecular, Inc.*, No. CV 19-1126-LPS, 2021 WL 1854650, at *5 (D. Del. May 10, 2021). There, the claims recited a "first module" and a "second module" and the parties disputed whether a first module requires a location distinct from that of the second module. *Id.* The court found it did not, even though that was the case in some exemplary embodiments. *See id.* (citing *Liebel-Flarsheim Co.*, 358 F.3d at 913). The court also rejected the defendant's argument that by not requiring distinct modules, this would read out the "first" and "second" limitations. *Id.*

Here, the intrinsic evidence similarly confirms that Defendants' construction is too narrow. For example, in the '080 and '205 patents (which require a first and second "display"), the specification confirms that while those displays "**may** be provided as entirely separate devices" (Ex. 3 at 5:46-47) (emphasis added), "in one embodiment, the two displays 102 and 104 may comprise separate portions *of a unitary display*. As such, the first display 102 may be a first

21

portion of the unitary display and the second display 104 may be a second portion of the unitary display." *Id.* at 5:65-6:3 (emphasis added).  The specification further explains that "the unitary display may have first and second portions corresponding to and acting in a similar manner to the first and second display 102 and 104 of the handheld computing device . . ." *Id.* at 6:8-12.  Thus, the specification discloses embodiments of two displays that are not entirely separate and distinct.

The specification also confirms that displays/screens can share common components, which again, would be precluded by Defendants' construction.  For example in the '080 and '205 patents (which use the term display), the specification discloses:

> In FIG.  6A, the first 102 and second display 104 are arranged side-by-side such that a crease 196 separates the displays. . . . **A touch sensor 106′ may span the width of both the first display 102 and the second display 104. In this regard, the touch sensor 106′ may span the crease 196 without interruption.** Alternatively, as shown in FIG.  6B, separate touch sensors 106″ and 108″ may be provided on either side of the crease 196.

Ex. 4 at 7:21-35 (emphasis added); *see also* Ex. 3 at 7:16-30. Thus, even in an embodiment with two displays (102 and 104), the specification discloses that a shared component (a single touch sensor) can span both displays, *i.e.*, that the two displays are not entirely separate and discrete. Again, Defendants' proposed construction would improperly exclude this disclosed embodiment.

The '050, '135, '577, and '842 patents (which use the term "screen") contain similar disclosures.  For example, the specification discloses that a single display can span across multiple screens (*see, e.g.*, Ex. 1 at 3:28-33), and that a single display controller can be used to control the output display and touch sensing functionality of multiple screens.  *See, e.g.*, Ex. 1 at 11:8-19 ("One or more display controllers 216a, 216b may be provided for controlling the operation of the touch sensitive screens 104 and 108, including input (touch sensing) and output (display) functions.") Defendants' construction also contradicts these disclosures and would exclude these embodiments.

Defendants have not identified with particularity any disclosure from the intrinsic record that requires the displays or the screens to be "separate and distinct." Notably, with respect to other components, the patentees would indicate when those components needed to be separate and distinct. For example, claim 17 of the '050 patent requires a first screen that has a first configurable area and a first touch sensitive display, while dependent claim 19 further requires that "the first configurable area is separate from the first touch sensitive display"—the inventors were explicit when separation was required. Ex. 5 at Cls. 17, 19. That "separate" language is not found in any of the asserted claims that require a "first" and "second" display or screen—and that absence is telling.[10]

### b. Defendants' Answering Position

The intrinsic evidence establishes that the separately claimed "first" and "second" screens/displays are distinct structures. Four patents ('050, '135, '577, '842) define "screen" to mean "a physical structure that includes one or more hardware components that provide the device with the ability to render a user interface and/or receive user input." *Google*, D.I. 78, Ex. A at 1; *Motorola*, D.I. 83, Ex. A at 1.[11] The two other patents ('080, '205) use the opposite nomenclature, defining "display" instead of "screen" to refer to the "physical hardware." *Google*, D.I. 78, Ex. A at 1; *Motorola*, D.I. 83, Ex. A at 1. In both contexts, the patents specify that a device with a "first

---

[10] To be clear, while Multifold advocates that the plain and ordinary meaning of first and second screen/display need not require that the first and second screen/displays be separate and distinct components (i.e., they can share components), Multifold's position still requires a first and second delineable screen/display.

[11] The two patents not at issue for these claim terms, the '494 and '756 patents, include the same definition of "screen" as the '050, '135, '577, and '842 patents.

screen" and a "second screen," or a device with a "first display" and a "second display," has **two** separate physical structures.[12]

When a claim lists elements separately, the "clear implication" is that these elements are "distinct components" of the invention. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (cleaned up); *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 935-36 (Fed. Cir. 2013) ("first and second occluding disks" were "separate, physically distinct structures" and could not be read on a single tubular piece of mesh). Even Multifold acknowledges this "'presumption,'" *supra* at 21 (quoting *EcoFactor*, 92 F.4th at 1058), which applies fully here. The claims of all six patents refer to the "first" screen separately from the "second" screen. *See* Ex. 5, cls. 17, 20; Ex. 6, cls. 3, 9; Ex. 7, cls. 17, 18, 20; Ex. 1, cls. 1, 11; Ex. 4, cl. 12 (where display means physical hardware); Ex. 3, cls. 15, 19 (same). Thus, the claimed first screen and second screen presumptively are separate and distinct structures.

The specifications support and emphasize that the claimed "first" and "second" screens are separate structures. The '050, '577, '842, and '135 patents stem from the same provisional application, No. 61/539,884, and share similar specifications. Each patent discloses a device with a primary and a secondary screen, each having its own components and capable of independent function (*e.g.*, one on and the other off). *See, e.g.*, Ex. 7 at 10:38-50. The figures consistently and exclusively depict two screens that are clearly separate and distinct. *See, e.g.*, Ex. 5 at figs. 1A-1J, 3A, 6A-6J. And the specifications disclose various configurations and orientations for the two screens, *e.g.*, "easel," "modified easel," and "open," with the two screens rotating relative to each other. *Id.* at fig. 3A, 13:5-14:21.

---

[12] For simplicity, unless otherwise stated or explicitly discussing the '080 and '205 patents, references here to "screen" assume its usage as physical hardware, as it is used in the '050, '135, '577, and '842 patents.

Importantly, the specifications also make clear that a single physical screen can have more than one "display" by defining "display" separately (as discussed in the preceding section). Thus, a "screen" is defined by its physical structure, not by what it shows. Two *areas* of one physical structure may be two "displays," but those areas are not two "screens." *E.g.*, Ex. 2 at 8:60-62 ("[S]creens 104 and 108 may include more than one display area.").

Similarly, the '080 and the '205 specifications (in which the "display" is the physical component, and the "screen" is implemented in software) consistently and exclusively describe displays as separate and distinct structures. These patents disclose various configurations and orientations for the two displays. *See, e.g.*, Ex. 4 at 4:51-61, 5:22-48, 7:19-35. Examples include a "slider mechanism" allowing the first and second displays to move relative to each other, *id.* at 5:24-29, and a "clam shell type arrangement" with a hinge between the displays, *id.* at 5:30-33. *See also, e.g.*, *id.* at 2:36-63, 3:32-40, 3:66-4:2, 4:9-6:12, 10:26-29, figs. 1, 3A-K, 5A-C, 6A-B.; Ex. 3 at 2:24-28, 2:39-65, 3:33-41, 3:67-4:3, 4:10-6:15, 10:36-39, figs. 1, 3A-K, 5A-C, 6A-B. Again, these disclosures would make no sense if the claimed displays are not separate physical structures. Forlines Decl. ¶ 61. And, like the first set of patents, the '080 and '205 patents make clear that a single physical structure ("display") can have more than one "screen," and that two such areas of one physical structure may be two "screens" but are not two "displays." Ex. 4 at 4:20-35. The specifications "nowhere give[] an example" of "first" and "second" screens that are not separate and distinct. *Regeneron Pharms., Inc. v. Mylan Pharms., Inc.*, 130 F.4th 1372, 1382 (Fed. Cir. 2025).

Multifold resists Defendants' construction because Multifold's infringement theories rest on treating *one* physical screen in the Accused Products as *two* screens. The two so-called "screens" are shown below in an example from one of Multifold's infringement claim charts:

25

Multifold added red boxes to artificially divide the Motorola phone's single "*Main Screen*" into two halves that are not separate or distinct at all.  Ex. 24 at 2.



Nothing Multifold cites from the specifications overcomes the legal presumption or the clear intrinsic evidence that the first and second screens are separate and distinct structures.  For the '050, '135, '577, and '842 patents, Multifold cites two portions of the specifications.  *See supra* at 22 (citing Ex. 1 at 3:28-33, 11:8-19).  The first is the patents' disclosure that a single display can span across multiple screens.  But as explained above, that disclosure **supports** Defendants' constructions: it makes clear that the "screen" is a physical structure, and not what is shown on the screens (which is a "display").  A display may span multiple screens with the screens remaining separate structures, just as an advertisement may be shown across multiple adjacent separate digital billboards in Times Square.

Multifold next cites the disclosure that a single display controller can manage two screens. *Id.* (citing Ex. 1 at 11:8-19).  This is irrelevant, because the "display controller" is not part of the screen but a separate component, as is explicit in the statements Multifold itself cites.  *See* Ex. 1 at 11:8-19 (the "display controllers" are elements 216a, 216b, while the "screens" are 104, 108); *see also id.*, fig. 2 (block diagram of components).  As Dr. Forlines explains, a single controller or

26

processor is capable of operating multiple distinct screens, and that was, in fact, a common setup at the time of the alleged invention. Forlines Decl. ¶ 46. In any event, Defendants' construction does not preclude the two screens from both interacting with another component in the phone. The phone may have just one processor, one memory, one antenna, and so on—indeed, this is what Figure 2 of the specification shows—but the point is that the two ***screens themselves*** are separate and distinct from each other. Accordingly, how many controllers are used to operate two separate screens has no impact on their physical relationship. *Cf. Koninklijke Philips N.V. v. Wangs All. Corp.*, 2017 WL 6329616, at *12 (D. Mass. Dec. 11, 2017).

Multifold fares no better in its attempt to overcome the presumption for the '080 and '205 patents. First, Multifold misinterprets the specifications by pulling disclosures out of context to suggest that "two displays … may comprise separate portions of a unitary display." Ex. 3 at 5:65-6:3; *see supra* at 21-22. However, the cited disclosures relate to a ***different device than the one claimed***. The specification expressly differentiates between the claimed "handheld computing device," which has two distinct physical displays, and an unclaimed "unitary display"—such as an external monitor—that may be ***connected to*** the handheld device to "emulate" the two physical displays. *See* Ex. 3 at 6:3-12. The asserted claims are directed to the disclosed "handheld computing device" with two physical displays, not the external "unitary display" monitor. *See, e.g.*, Ex. 4, cl. 12; Ex. 3, cl. 15. Therefore, Multifold's arguments regarding the unclaimed "unitary display" do not overcome the presumption.

Second, and like its incorrect "controller" argument for the other four patents, Multifold contends that, because "touch sensor 106'" described in the '080 and '205 patents can span two physical displays, the two cannot be "entirely separate and [distinct]." *Supra* at 22 (quoting Ex. 4 at 7:21-35). But the "touch sensor" is a distinct physical structure from the displays, not a "shared

27

component" of the displays.  The specification describes "touch sensitive device[] 106'"—the "touch sensor" Multifold identifies—as a separate component from the first and second displays 102 and 104, and notes that the "touch sensor" may be "provided *in addition to*" the displays. Ex. 3 at 7:35-37 (emphasis added).  In fact, the specification describes "a *combination* of touch screen displays (e.g., 110, 112) and *off display touch sensors* (e.g., *106'*, 106", 108") [that] may be provided for a single device."  *Id.*, 7:37-40 (emphasis added).  Again, the two displays could both interact with one touch sensor or both be connected to one touch sensor; Defendants' proposal does not preclude the displays from being connected or coupled.  It does, however, require identifying a separate "first display" and "second display" rather than using a single display to satisfy both limitations.  Multifold's cited "touch sensor" disclosure supports Defendants' construction by emphasizing the separate nature of the first and second displays.

The cases Multifold cites in attempting to counter the presumption of separateness are easily distinguishable.  *See supra* at 21 (citing *EcoFactor*, 92 F.4th at 1058; *Linear Tech.*, 566 F.3d at 1054-55; *Neumodx Molecular*, 2021 WL 1854650, at *5).  In two of these cases, the courts relied on explicit patent disclosures to rebut the presumption of separateness.  For instance, in *Linear Tech.*, the specification expressly disclosed that a "second" and "third" circuit could share common components.  566 F.3d at 1055.  Similarly, in *EcoFactor*, the court found that a "separate and distinct" construction for two claimed "inputs" was improper because the specification disclosed an embodiment where one input was based on another.  92 F.4th at 1058.  As explained, there are no such disclosures here.  Additionally, all three of Multifold's cases involved elements defined by their function, rather than physical structure.  *See id.* ("inputs" into a calculation); *Linear Tech.*, 566 F.3d at 1054-55 ("circuits" performing functions); *Neumodx Molecular*, 2021 WL 1854650, at *5 ("modules" of components "configured to produce a desired result or results").

28

Courts found that these separate *functional* elements need not be *physically* separate and distinct. *See Linear Tech.*, 566 F.3d at 1055 (finding that nothing in the intrinsic record supported "construing the terms to require a specific *structural* requirement or entirely distinct 'second' and 'third' circuits" (emphasis added)); *Neumodx Molecular*, 2021 WL 1854650 at *5 ("[T]here is nothing in the claim language or specification that justifies eliminating all overlap in location."). Here, by contrast, the patents claim two physical hardware components—screens—which "logically cannot be one and the same." *Uniloc 2017 LLC v. Google LLC*, 2020 WL 512605, at *9 (E.D. Tex. Jan. 30, 2020) (quoting *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404-05 (Fed. Cir. 1996)).

As a last resort, Multifold cites a non-asserted dependent claim, claiming it shows that "the inventors were explicit when separation was required." *Supra* at 23. This superficial argument misses its mark. The claim refers to *logical*, *software* features on a *physical* screen—a "configurable area" and a "touch sensitive display." *See* Ex. 5 at 10:50-11:14 (disclosing that each touch sensitive screen can comprise a touch sensitive display, a gesture capture region, and a configurable area). This is irrelevant to claims reciting two physical structures.

In short, Multifold points to nothing in the intrinsic record that overcomes the "clear implication" that the separately claimed "first" and "second" screens are indeed two, distinct physical things. *See Becton*, 616 F.3d at 1254. Every disclosure in the patents—including those Multifold cites—supports this presumptive interpretation of the claim language.

### c. Plaintiff's Reply Position

For the '050, '135, '577, and '842 patents, the parties agree that the term "screen" should be construed to mean "a physical structure that includes one or more hardware components that provide the device with the ability to render a user interface and/or receive user input," which is how each of the patents define the term. *See, e.g.*, Ex. 8 at 3:57-60. Thus, the parties agree that

each of the claimed first and second screens can include more than one hardware component that provides the device with the ability to render a user interface and/or receive user input. Similarly, for the '080 and '205 patents, the parties agree that the analogous term "display" should be construed to mean "physical hardware that is operable to render as screen," which is how each of the patents define the term. Ex. 3 at 4:18-22. Nothing in the claim language requires the first and second screen/display to be "separate and distinct components" (e.g., without sharing common or overlapping components). Reading in such a requirement would be contrary to the intrinsic record.

Defendants' arguments to the contrary are misplaces, as its case law is inapposite. For example, in *Regents of Univ. of Minn. v. AGA Med. Corp.*, the two disks of the claims could not be read on a singular tubular piece of mesh because the claim language described the two disks as "'affixed' (claims 1, 4, 23, 24, 30), 'joined' (claims 17, 24, 25), or 'connected' (claim 28) to one another, forming a 'conjoint' structure (claims 1–5, 9, 11, 12, 14, 15, 23, 25–27)." 717 F.3d at 935. The specific context of the claims required this result. Similarly, in *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, the spring means and the hinged arm had to be separate structures because specific claim language "describes the spring means as being 'connected to' the hinged arm." 616 F.3d at 1255. Essentially, because the components were described in the claims as connected to one another, on their own, the components had to be separate and distinct. Here, the claim language of the '050, '135, '577, and '842 patents simply recite a first screen and a second screen without any claim language describing how the first screen and second screen are connected to one another. Similarly, the '080 and '205 patents simply recite a first display and a second display without any claim language describing how the first screen and second screen are connected to one another. Ex. 20 at ¶ 66. Nothing in the claim language or intrinsic record prevents

30

the first and second screen/display from sharing some common or overlapping components, so long as the they perform their respectively claimed functions.

Defendants also wrongly contend that "the specifications nowhere give an example of first and second screens that are not separate and distinct." *Supra* at 25 (quotations omitted).  But, as noted above, the specifications include express definitions of "screen" (for the '050, '135, '577, and '842 patents) and "display" (for the '080 and '205 patents) that omit any such "separate and distinct" requirement.  Defendants' construction effectively seeks to redefine "screen" as "a separate and distinct physical structure . . ." and "display" as "separate and distinct physical hardware."  (Red terms not found in the intrinsic record.) That is not how the patentees defined the terms.  And other disclosures make clear that the first and second screens/displays need not be separate and distinct.  For example, the '080 and '205 patents disclose that "[t]he handheld computing device 100 may include a first display 102 and a second display 104.  Additionally, *while two displays (102, 104) may be shown and described below* with regard to the functionality of various embodiments of handheld computing devices, *a handheld computing device may be provided that includes <u>one</u>* or more displays." Ex. 3 at 4:11-15. Thus, the patents disclose providing the functionality of displays 102 and 104 on a handheld computing device with a single display, an embodiment improperly excluded under Defendants' proposed construction.  Ex. 20 at ¶ 68.

Multifold provided other examples from the specifications supporting its proposed construction (*supra* at 21-23), and Defendants' critique of those disclosures misses the mark.[13] For example, Defendants' assertion that "each patent discloses a device with a primary and a secondary

---

[13] At minimum, because the patents disclose that the screens/displays need not be separate and distinct, Defendants' attempts to distinguish Multifold's case law fails.  *Supra* at 28-29.

31

screen, each having its own components and capable of independent function" (*supra* at 24) is belied by Defendants' reliance upon a portion of the specification that includes a disclosure that "[o]ne . . . display controller[] may be provided for controlling the operation of the touch sensitive screens." *See, e.g.*, Ex. 7 at 10:37-50. In an attempt to diminish this disclosure, Defendants assert that the display controller cannot be a part of the claimed screen. *Supra* at 26-27. But display controller is not recited in the asserted claims, and the specifications describe the "display controller" as "controlling the operation of the touch sensitive screens 104 and 108, including input (touch sensing) and output (display) functions." Ex. 7 at 10:38-50. These functionalities align with the definition of the term "screen," which "includes one or more hardware components that provide the device with the ability to render a user interface and/or receive user input." *Id.* at 2:66-3:2. And the specification explains that "the functions of a touch screen controller 216 may be incorporated into other components." *Id.* at 10:45-48; Ex. 20 at ¶ 69.[14]

Defendants' critique of Multifold's reliance upon the disclosure in the '080 and '205 patents that a single touch sensor can span the crease between and connect two displays together is similarly off base.  Defendants characterize the touch sensor as a separate component, but the specification teaches that touch sensors and displays can together comprise a touch screen display. *See, e.g.*, Ex. 3 at 6:47-49.[15] And Defendants' critique of the '080 and '205 patents' disclosure of

---

[14] Relying upon Dr. Forlines, Defendants also assert that "a single controller or processor is capable of operating multiple distinct screens, and that was, in fact, a common setup at the time of the alleged invention." *Supra* at 27. However, even if that were correct, the fact that a single controller was *capable* of operating multiple distinct screens at the time of the invention has no bearing on whether the claims require the first and second screens/displays to be separate and distinct components.  Once again, Defendants are trying to make mandatory one possible configuration for how multiple screens/displays could be related to one another.

[15] Even if separate components, Defendants' assertion that its claim construction proposal "does not preclude the displays from being connected or coupled" raises questions regarding what is required by Defendants' insistence that the first and second screens/displays must be "two separate

ME1 53150038v.1

a unitary display nonetheless admits that the patents teach replicating the functionality provided by two distinct physical displays in a single external unitary display.  Ex. 20 at ¶ 70.

In their response, Defendants inject screenshots from Multifold's infringement contentions to further muddy the analysis.  *Supra* at 26. But, whether or not a specific accused product includes two screens—which to be clear, it does—has no impact on how the terms first and second screen/display should be construed.  However, in order to rebut Defendants' assertions, images of example accused products below clearly show each of the products to have first and second screens/displays, whether or not "entirely separate and distinct" from one another.  For example, each of the products below are capable of orienting their respective screens/displays in various configurations with respect to one another (in the manners described in Defendants' response, *supra* at 24-25), including by rotating the screens/displays relative to each other and through use of a hinge between the screens/displays.






---

and distinct components." Dr. Forlines was not able to adequately answer this question at his deposition. Ex. 21 at 82:3-89:2.

ME1 53150038v.1

#### d. Defendants' Sur-Reply Position

The governing law is clear:  where a claim lists elements separately, those elements are "presume[d]" to be "distinct components" unless the intrinsic evidence suggests otherwise. *Becton*, 616 F.3d at 1254 (cleaned up).  Far from rebutting that presumption, the intrinsic evidence here confirms—and Multifold's expert conceded—that the claimed "first" and "second" screens are separate and distinct structures.  *Supra* at 24-25.

Despite previously agreeing with this well-established legal presumption, *supra* at 21, Multifold now tries to backtrack, suggesting that separately listed components are presumed distinct only if the claims describe the components "as connected to one another."  *Supra* at 30-31.  That is simply not the law.  The Federal Circuit has routinely applied the presumption even where the claims do not specify any connection between components.  *See, e.g.*, *Regeneron*, 130 F.4th at 1379 ("clear implication" that separately listed components are "distinct" (quoting *Becton*, 616 F.3d at 1254)); *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004) (same).  If binding precedent were not enough, Multifold's own expert agreed that, "by using the word first and second one would assume that they're different." Ex. 32 at 232:21-233:4.  Multifold cannot escape the legal presumption and its own expert's admission that the recited "first" and "second" screens (or displays) are separate and distinct.

The intrinsic evidence confirms this claim interpretation.  *Supra* at 24-25.  The specifications separately label the two screens and repeatedly describe them as moveable relative to each other and independently operable.  *See* Ex. 21 at 82:23-83:16; *see also, e.g.*, Ex. 5 at Fig. 3A, 13:5-14:21 (positions); Ex. 7 at 10:37-50 (independent function).  Claim 11 of the '842 patent (Ex. 1) even specifies a particular relative orientation of the two screens, which would be "facially nonsensical" if they were not separate and distinct.  *Becton*, 616 F.3d at 1255.

34

Multifold points to language in the '080 and '205 patents describing a handheld device with one display[16] instead of two. *Supra* at 31 (citing Ex. 3 at 4:11-15). But that device is irrelevant because it does not have a first *and second* display. *See* Ex. 3 at 4:10-15; Ex. 5 at 4:11-17. The single-display embodiment is covered by different, unasserted claims. *See, e.g.*, Ex. 3, cl. 1 (unasserted claim directed to a handheld computing device "including one or more displays"). Defendants' construction thus does not improperly exclude any embodiments.[17]

Both the specifications and Multifold's expert undermine Multifold's assertion that the disclosed "display controller" may be a shared component of the screens. *Supra* at 32. The specifications describe the "display controllers" as separate from, and "controlling the operation of," the "screens." Ex. 7 at 10:37-39. Multifold's expert agrees that the specifications do not include any example of the display controller "being considered part of the screen." Ex. 32 at 178:9-15. Just as a single power source may power many separate and distinct components in a device, a single display controller may control separate and distinct screens. *See* Ex. 31, ¶ 55. Multifold's reliance on the "touch sensor" in the '080 and '205 patents is similarly misplaced. *Supra* at 32-33. Those patents delineate touch sensors and displays as distinct components and label them differently. Ex. 3 at 6:45-7:42, Fig. 1. Multifold attempts to confuse the issue by citing to the patents' labeling the touch sensor and display components collectively as a "touch screen display" in one embodiment. *Id.* at 6:45-49. But even this embodiment describes and depicts the "touch sensor" and "display" separately. Critically, just as in Defendants' construction, the "first"

---

[16] These patents use the term "display" to refer to the hardware "screen" from the other patents.

[17] Defendants' construction also does not improperly exclude the unclaimed "unitary display" disclosure, which Multifold relied on in its opening brief but thereafter effectively jettisoned. *See supra* at 33. At any rate, Dr. Surati undermined Multifold's reliance on that disclosure, testifying that the "unitary display" consists of *three* separate physical displays: a "first" display, a "second" display, and a third external display. Ex. 32 at 179:19-180:6.

35

and "second" "displays" are separate and distinct components, as are the "first" and "second" "touch screen displays."  *Id.* at 6:45-61, Fig. 1.

### B. DISPUTED TERMS FROM THE '842 PATENT

#### 1.    Image Capture Mode

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 2. | Image capture mode | 842: 1, 11 | "a mode, including a type of display, for the image capture function" | "a mode in which the device can capture images, distinguished from other image capture modes by a difference in one or more of the device's configurations" |

#### a.    Plaintiff's Opening Position

The '842 patent is about an improved image capture application/function (*e.g.*, a camera application) for a dual-screen device.  *See, e.g.*, Ex. 1 at 32:18-19; Fig. 11. The patent discloses that the application (or function) can enter into a number of different "image capture modes," *Id.* at 32:36-40; 33:38-44; 34:37-39; 35:59-64.   In the claims, which mode the image capture application/function enters into is "based on," "one or more of the image caption function configuration, the device orientation, and the device state." *Id.* at Cls. 1, 11. The device orientation may be, for example, landscape or portrait.  The device state may be open (*i.e.*, unfolded) or closed. And different image caption function configurations are disclosed in the patent, for example, whether and which of the screen(s) shows a "preview" of the to-be-captured image or not, or a "self-portrait configuration." *See id.*, at *e.g.*, Figs. 14A, 14B, 15A and 33:37-61; Figs. 16A-16B, 33:62-34:8; Fig. 18, 34:40-63.  The appropriate mode is then presented to the user.  *See, e.g.*, Fig.

36

13. The claim also requires "in each image capture mode, a display on the first or second screen is different." Ex. 1 at cls. 1, 11.

Plaintiff's proposal is consistent with the claims and the specification's teaching. The image capture mode is a mode for the image capture function, *e.g.*, the phone's camera app. The mode is associated with—it includes—a type of display. As the claims make clear "in each image capture mode a display on the first or second screen is different." Ex. 1 at Cls. 1, 11.

In contrast, Defendants' proposed construction is in conflict with the claims. According to Defendants, one image capture mode is distinguished from another mode by a difference in the device's configurations. But this is not how the claims are structured or what they require. As an initial matter, it is unclear whether Defendants intend for "device configuration" (which is not recited in the claim) to be the same or different than device state and device orientation (which are recited). Regardless, the claims' plain language—"based on"—is not as restrictive as Defendants' construction. The claims do not have a one-to-one requirement, where every time a device configuration changes the mode must change. Defendants' construction also fails to account for the fact that the image capture mode may be based on the configuration of the image capture function, not just the overall configuration of the device. Plaintiff's construction more naturally aligns with the language of the claims, along with the remainder of the intrinsic record.

### b. Defendants' Answering Position

This dispute turns on whether "image capture mode" receives a meaningful construction that helps the parties, Court, and jury understand and differentiate among "image capture modes," as Defendants propose and the claims require, or whether it receives a circular and meaningless definition offering no way to distinguish among image capture modes, as Multifold proposes.

The claims require that the device's "image capture modes" be distinguishable. Claims 1 and 11 specify that "***in each image capture mode** a display on the first or second screen is*

*different*."  Applicants relied on this distinction during prosecution to overcome prior art.  Ex. 25 at 1-10, 16-18.  Thus, any construction of "image capture mode" must allow differentiation among modes (*i.e.*, to know the circumstances in which the displays must be different).

Defendants' proposed construction aligns directly with the claim language, which explains how the "image capture mode" is determined.  First, the device "determines" one or more of three device configurations, namely, a device orientation (*e.g.*, portrait or landscape), a device state (*e.g.*, open or closed), and/or an image capture function configuration (*e.g.*, "self-portrait" or forward-facing).  Ex. 1, cls. 1, 11.  Then, it "enters" an image capture mode "based on" the configuration(s).  *Id.*  The claim language itself thus sets the criteria for determining the image capture mode, and in turn, the criteria to differentiate among image capture modes.  Defendants' construction reflects this: each image capture mode is "distinguished from other image capture modes by a difference in one or more of the device's configurations [*i.e.*, the device orientation, device state, or image capture function configuration]."[18]

The specification is in accord with the claims and Defendants' construction.  For instance, Figures 14A-14B, 15A-15B, and 16A-16B illustrate a "first set of modes."  Ex. 1 at 33:38-40.  These modes share the same device state (closed) and orientation (landscape) but have "different outward facing configurations" and, as in the claim, different content on one of the screens.  *Id.* at 33:38-34:8.[19]  The specification also gives examples of different image capture modes based on

---

[18] To clarify and address Multifold's objection, Defendants would agree to substitute "the image capture function configuration, the device orientation, and the device state" for "the device's configurations" in Defendants' construction.  The intended meaning is the same.

[19] Multifold misstates Defendants' position in arguing that it "fails to account for the fact that the image capture mode may be based on the configuration of the image capture function, not just the overall configuration of the device."  *Supra* at 37.  To the contrary, a difference in the configuration of the image capture function would be a difference "in one or more of the device's configurations" and is thus accounted for in Defendants' construction.

38

device state or orientation.  *E.g.*, *id.* at 33:24-37 ("based on the new orientation, the device 100 may present a new image capture mode…").

On the other hand, Multifold's construction lacks boundaries or guidance on defining a "mode" or differentiating between "modes."  Instead, Multifold simply rearranges the term to "a mode, including a type of display, for the image capture function."  The "including a type of display" clause is redundant, as the claims already specify that "in each image capture mode a display on the first or second screen is different."  Multifold acknowledges as much. *Supra* at 36-37.  And the "mode … for the image capture function" language is merely a circular definition that fails to help the jury determine what exactly the different image capture modes are, and thus whether those image capture modes satisfy the undisputed different-display requirement.  *See Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997) (noting that a "compelling reason" to reject a proposed construction is that it "would make the limitation entirely circular"); *see also ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003).

Multifold's non-construction would allow it free rein to manipulate the "image capture mode" construction to suit its inconsistent infringement and validity positions.  For example, Multifold arbitrarily could define multiple different image capture "modes" for a prior art device even if the device orientation, state, and image capture function configuration are unchanged. Multifold then could argue that the prior art device fails the "wherein" limitation because the display on the screens is the same across these supposed "modes."  Conversely, Multifold could arbitrarily define as a single "image capture mode" what are actually multiple different image capture modes in the accused products that are entered into based on multiple different device

configurations, and thus avoid having to prove that the display is different across these modes.[20]
"A patent may not, like a nose of wax, be twisted one way to avoid anticipation and another to find infringement." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Multifold's position would allow it to treat the '842 patent's claims like the proverbial "nose of wax" and should be rejected.

### c. Plaintiff's Reply Position

The parties' dispute is whether each and every change in an image capture function configuration, device orientation, and device state necessarily results in a different image capture mode (Defendants' proposal) or if, consistent with the plain language of the claim, the image capture mode is simply "based on" one or more of these characteristics (Multifold's construction).

Defendants readily acknowledge that the '842 patent's specification provides examples of image capture modes "based on device state or orientation." *Supra* at 38-39 (citing Ex. 1 at 33:24-37). Defendants also acknowledge that the image capture mode can be based on an image capture function configuration. *Supra* at 38-39 (citing Ex. 1 at 33:38-34:8). These disclosures are entirely consistent with Multifold's construction. Multifold's construction is also consistent with the claims, which as a whole only require that an image capture mode be "based on" one or more of these characteristics. There is nothing in the claims or the specification that requires every unique combination of these characteristics to result in a different image capture mode. For example,

---

[20] To be clear, the claim only requires the device or method to "determine" "one or more" of the following: image capture function configuration, device state, and device orientation. If a device does not determine a device orientation, for example, then a change in device orientation would not, per the claim, result in a new image capture mode. The key point is that (i) the image capture modes in a device are distinguished from one another by one or more of these three criteria, and (ii) if a device uses one or more of the criteria to enter image capture modes, then for purposes of assessing infringement and invalidity, the party with the burden of proof must consider all image capture modes and demonstrate that each mode has a different display on the first or second screen.

nothing in the claims or the specification precludes two different permutations of device orientation, state and image function configurations resulting in the same image capture mode.

Defendants do not meaningfully dispute that the intrinsic evidence supports this conclusion, but instead express concern that Multifold may somehow use its construction to interpret the claims differently for validity and infringement. *Supra* at 39-40. At a minimum, this concern is premature, a hypothetical, and not a claim-construction issue. Regardless, to the extent Defendants' alleged concern is that under Multifold's construction, one image capture mode cannot be differentiated from another, the remainder of the claim addresses this concern requiring that "in each image capture mode a display on the first or second screen is different." Ex. 1 at Cls. 1, 15. This claim enables a POSITA to distinguish one image capture mode from another and obviates any professed concern Defendants may have about Multifold's proposed construction.

### d. Defendants' Sur-Reply Position

Multifold does not dispute that the claims require the device's "image capture modes" to be distinguishable from each other. *Supra* at 38-39; *supra* at 40-41. Multifold claims the intrinsic record is "consistent" with its construction but does not explain how. *Supra* at 40-41. Moreover, Multifold acknowledges that other claim language requires a display. *Id*. Removing that redundant phrase leaves Multifold's construction of "image capture mode" as just "a mode … for the image capture function." Multifold also has it exactly backwards in arguing that the claim language "in each image capture mode a display on the first or second screen is different" allows a POSITA to distinguish between "image capture modes." *Id*. That language sets forth criteria the "image capture modes" must meet to practice the claims, not how to define them. Multifold's arguments confirm the redundant and circular nature of its proposed construction.

### 2. Providing

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 3. | Providing | 842: 1 | "supplying, having, preparing, or making available for use" | "making available for use" |

#### a. Plaintiff's Opening Position

Claim 1 of the '842 patent is a method for using an "image capture function" (*e.g.*, a camera application) on a multi-screen device. The first step in the method is "providing" a device with a first and second screen. Ex. 1 at Cl. 1.

Defendants' proposed construction of "providing" is unduly narrow and appears to be with an eye towards manufacturing an improper divided infringement defense—presumably Defendants intend to argue that an end user does not make an accused phone available for use, *i.e.*, "provide," under their construction. This exact argument was addressed and rejected in *Meyer Intel. Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354 (Fed. Cir. 2012). *Meyer* involved patents claiming methods for frothing milk. The claims first required "providing" a container and then the remaining claim terms related to the use of that container. Bodum, the defendant in *Meyer*, unsuccessfully argued no direct infringement because Bodum's end users do not "provide" the containers. The Federal Circuit rejected that argument, noting that "anyone who takes a Bodum frother from the kitchen cabinet and places it on the counter before filling it with milk can satisfy the 'providing' step.… Accordingly, we construe the term 'providing' to mean 'furnishing, *supplying*, making available, *or preparing*' and find that anyone—Bodum or the end user of its products—can satisfy the providing step. Given this construction, we find that the claims at issue here are drawn to actions that can be performed by a single party." *Meyer*, 690 F.3d at 1369.

Here, the intrinsic record confirms that the same conclusion should be reached—that "providing" should be broadly construed in a manner consistent with Plaintiff's construction such

42

that all steps of the '842 patent's claims can be performed by a single party.  First, the at-issue claim limitation is simply "providing a device having at least first and second screens." Ex. 1 at Cl. 1. There is nothing specific about what must be done to "provide" the device.  Second, the specification broadly uses the term "provid[ing]," which demonstrates the breadth of the term. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999).  The term is used in various contexts in the written description to refer to providing: "visual output" (Ex. 1 at 11:4, 12:50-55, 23:20-30, 24:10-15, 31:14-16), "a signal indicating of multiple relative positions" (*id.* at 12:53-54), "the device 100 a user gesture" (*id.* at 23:25), "the device 100 with one or both of a twist and tap gesture or a flip and slide gesture" (*id.* at 24:12-14), "a max mode or other setting" (*id.* at 31:14-15), "a device having at least first and second screens" (*id.* at Cl. 1). Defendants' narrow proposed construction would exclude and be inconsistent with some of these uses of the term.  Third, Defendant has not identified any alleged disclaimer that would limit the scope of the claim.  Thus, Multifold respectfully requests that the Court adopt its plain meaning construction of "providing," mooting Defendants' efforts to manufacture a divided-infringement dispute.

### b.  Defendants' Answering Position

"Providing" should be construed as "making available for use."  This is the term's plain meaning and is supported by the intrinsic (and extrinsic) record.  Multifold's proposed construction incorrectly reads this method step out of the claim by including passive non-actions like "having."

The plain meaning of "providing" is to "make available for use."  Ex. 26, New Oxford American Dictionary 1406 (3rd ed. 2010); *see also F'Real Foods, LLC v. Hamilton Beach Brands*, 2017 WL 5886011, at *1 (D. Del. Nov. 29, 2017) (construing "providing a mixing machine" to mean "making a mixing machine available for use").

43

Multifold's construction expands beyond the plain meaning of the act of "providing," to include non-acts, *e.g.*, "having."   As a prior decision from this District correctly observed in rejecting an identical argument, "Plaintiffs' construction … would essentially alter the 'providing [a device] step' by making it a passive step that merely describes what an unspecified apparatus must have."  *F'Real*, 2017 WL 5886011 at *1 n.4.  Such a construction is incorrect: "[a] method step is something that must be 'performed.'"  *Id.* (citing *Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1353 (Fed. Cir. 2013)).[21]

Defendants' plain meaning construction aligns with the claimed method and performance requirement.  The method first recites a step of "providing," *i.e.*, making available, "a device" with at least two screens.   Ex. 1, cl. 1.   The remaining method steps of "receiving" an input, "determining" something about the device's configurations, and "entering" an image capture mode, are all steps performed ***by the device*** that was provided.  *Id.*  In other words, as the claim language makes clear, the "providing" step is ***not*** one that is performed by the device itself, unlike the remaining method steps.  This distinction is also supported by the specification, which contrasts the steps performed by the device during use (*id.* at 10:51-60, 13:50-53, 16:20-23, 18:6-18, 28:37-43) as opposed to the configuration of the device ***as provided*** (*id.* at 23:22-26, 24:10-14).   In contrast, where the patentee wanted to claim a device passively "having" or "including" a characteristic rather than a method step, it did so.  *Id.* at 10:23-26.

The *Meyer* case cited by Multifold does not support its construction for two reasons.  First, *Meyer* did not construe "providing" as a passive non-action (*e.g.*, "having").   690 F.3d at 1369.

---

[21] The *F'Real* plaintiff initially proposed to construe "providing" as "having [a device] which is available for use," *F'Real Foods, LLC v. Hamilton Beach Brands, Inc.*, 457 F. Supp. 3d 434, 437 (D. Del. 2020), and subsequently proposed that "providing" meant "furnishing, supplying, making available, or preparing," citing the same case as Multifold, *Meyer Intellectual Properties Ltd. v. Bodum Inc.*, 690 F.3d at 1369.  *F'Real*, 2017 WL 5886011 at *1 n.4.

Second, *Meyer* addressed a method requiring end-user actions on a physical product, with steps like "providing" a container, "pouring liquid" into the container, introducing a plunger, and "pumping" the plunger to aerate the liquid. *Id.* at 1359-60. This differs critically from '842 patent claim 1, which claims method steps performed by the device (*e.g.*, "receiving user interface input"). Thus, *Meyer* does not support a broader interpretation of "providing" that includes characteristics of or actions performed by the device, nor does it answer Multifold's premature question of whether a single actor performs all steps of claim 1.

### c.  Plaintiff's Reply Position

Defendants' "providing" construction is too narrow in light of the intrinsic record and the plain meaning of the term. The parties agree that "providing" can mean "making available for use." Consistent with the intrinsic record and extrinsic evidence, Multifold proposes that "providing" can also mean, "supplying, having, [or] preparing." Defendants do not meaningfully dispute Multifold's construction as to the terms "supplying" and "preparing, " (*see supra* at 42-43, *see also supra* at 43-45); the dispute is apparently whether it may also mean "having."[22]

According to Defendants, "having" is improper because it is not an "active" step and Defendants rely on a footnote from *F'Real Foods, LLC v. Hamilton Beach Brands*, 2017 WL 5886011, a 2017 unpublished decision as support. But in *F'Real*, the court characterized that plaintiff's proposed "providing" definition as a passive "mere state of being." *F'Real* 2017 WL 5886011, at *1 n.4. Here, Multifold's construction does not render the "providing" term passive, but instead, and consistent with the plain meaning of the term "providing," and Federal Circuit

---

[22] Multifold would be amenable to a compromise construction for "providing" of "suppling, preparing, or making available for use" to the extent the Court believes this construction clarifies that the term "providing" is not mean to limit the claimed step to a specific party.

case law addressing the issue, clarifies that the term "providing" is not meant to limit the claimed step to a specific party.[23] *See Meyer*, 690 F.3d at 1369.

### d. Defendants' Sur-Reply Position

Multifold now recognizes that "providing" does not include the passive non-act of "having." *Supra* at 45 n.22. But Multifold continues improperly to seek a construction that includes passive steps. *Supra* at 46 n.23. The claim specifies that the "providing" step is neither performed by the claimed device nor describing a passive characteristic of the device. *Supra* at 43-45. Multifold cites no intrinsic evidence to the contrary, and its cited case only supports Defendants' construction. *See Meyer*, 690 F.3d at 1369 (noting "the claims at issue here are drawn to ***actions***") (emphasis added).[24]

### C. DISPUTED TERMS FROM THE '494 PATENT

### 1.     Wherein the auxiliary page is a child of the primary page

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 4. | Wherein the auxiliary page is a child of the primary page | 494: 1 | "wherein the auxiliary page is a secondary or ancillary page of the same application as the primary page" | "wherein the auxiliary page is part of the same application as the primary page and is accessed through interaction with the primary page"<br><br>In the alternative, indefinite. |

---

[23] This is not to say that Defendants' construction in fact limits who can perform the "providing" step (the user of a device, for example, can make it available for use by powering it on, or the device's security software can and "unlock" the device, thus making it available for use, for example). However, Multifold's construction is clearer on this point and therefore more helpful for a fact finder.

[24] While this issue is premature, Multifold's suggestion that an end-user performs any "providing" step is unsupported by citation to any intrinsic or extrinsic evidence. *See supra* at 46 n.23.

### a. Plaintiff's Opening Position

The Parties disagree about what it means for "an auxiliary page" to be a "child page" of the primary page. Multifold's proposal, that a "child page" is a "secondary or ancillary page of the same application as the primary page" is consistent with the term's plain meaning as confirmed by the intrinsic record (*see* Ex. 16 at ¶¶ 95-100). The term "child page" is also used in the claims according to the plain meaning a POSITA would understand. For example, a POSITA would understand the use of terms parent and child in provisional application 61/389,000 ("the '000 Provisional")[25] to be aligned with the plain and ordinary meaning in that both pages can be displayed, and the child page can be accessed without interaction with the primary page. *See* Ex. 16 at ¶ 101; Ex. 19 at MULTIFOLD-G-0014522 ("[t]he user expands the application to dual screen to see the parent (A1 LX) and the child (A1 LX +1)") . The '494 patent specification's use of "secondary"/"ancillary" (a synonym for the claimed child page) similarly aligns with a POSITA's understanding of the plain and ordinary meaning . *See* Ex. 16 at ¶¶ 102-03; Ex. 8 at 48:45-53 ("[once] a command to perform a maximization operation… has been received… . [b]oth the primary 3714 and the secondary 3710 pages are displayed as a result of the maximization[.]")

In contrast, Defendants' proposed requirement that the auxiliary page only be accessed through interaction with the primary page is contrary to the specification's teachings, *e.g.*, that both pages may launch simultaneously and therefore the secondary page need not be accessed through the primary page: "After a command to open an application 564 is received, the device 100 presents first and second pages of output associated with the opened application 564." Ex. 8 at 48:13-16; Fig. 40; *see also* Ex. 16 at ¶¶ 104-05.

---

[25]The '494 Patent does not claim priority to the '000 provisional, but at a minimum the '000 provisional is contemporaneous extrinsic evidence as it's priority date is October 1, 2010.

Furthermore, the specification describes an embodiment where, based on the output configuration of the device itself, an application's display preferences might direct the device to enter "bilateral mode, in which both displays are active to display different windows in the same application." *Id.* at 25:29-30.  The device can transition to bilateral mode, and "any other configuration" "depending upon which state device 100 is moved" *Id.* at 25:25-27.

Finally, Defendants have not explained how Multifold's construction would render the term indefinite, especially in light of the fact that a POSA would understand a "child" page to be the same as the disclosed "secondary" or "ancillary" page in the specification (Ex. 16 at ¶¶ 102-06), as discussed above.  Multifold respectfully requests the Court adopt its proposed construction.

### b.  Defendants' Answering Position

Claim 1 of the '494 patent is directed to a method for presenting a "primary page" and an "auxiliary page" of a "first application" on a multi-display device, where "the auxiliary page is a *child* of the primary page" (emphasis added).  The parties dispute the meaning of this "child" limitation.  Defendants propose a construction that aligns with the term's common meaning in the field and the intrinsic record, specifying a hierarchical relationship where the "auxiliary page … is accessed through interaction with the primary page."

At the outset, Multifold's construction should be rejected because it "ascribes no meaning to the term ['child'] not already implicit in the rest of the claim."  *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330-31 (Fed. Cir. 2008).  The claims already *expressly* require an auxiliary page and a primary page of the application, *see* Ex. 8, cl. 1, and "secondary or ancillary" are just synonyms for "auxiliary," *see id.* at Abstract, 46:48-49, 47:20, 48:20-21, 48:26, 48:42-56 (the only use of "auxiliary" in the specification is to describe page 3710; the specification also describes page 3710 as "secondary" and "ancillary"); *see also* Forlines Decl. ¶¶ 83-84.  As in *Mangosoft*, this defect in Multifold's construction is "particularly severe because [the patentee] added the word

['child'] to claim 1 during prosecution to distinguish prior art." *Mangosoft*, 525 F.3d at 1331. Specifically, the Examiner rejected the originally filed claims, which lacked a parent-child relationship between the primary and auxiliary pages, over U.S. Patent Publication No. 2010/0085382 ("Lundqvist"). Ex. 27, MULTIFOLD-G-0009059, -9618. The claims were allowed only after being amended to add the limitation "wherein the auxiliary page is a child of the primary page." Ex. 27, MULTIFOLD-G-0010048, -10051, -10056, -10066.

The intrinsic evidence fully supports Defendants' construction. The '494 patent incorporates by reference U.S. Provisional Application No. 61/539,884, Ex. 8 at 1:8-12, which discusses a "parent/child hierarchy" consistently with Defendants' construction. For example, the '884 provisional describes how "child windows" (*e.g.*, an individual email) are "originated" from parent windows," and that the "parent window launches a child window." Ex. 28, MULTIFOLD-G-0015444, -15453.

The specification also supports Defendants' construction by indicating that an application can be organized into "task[s]" and "sub-tasks" representing application components. Ex. 8 at 21:4-7. Each task provides a "window," which, like a "page," presents a user interface and/or content. *Id.* at 21:7-11. These tasks are organized hierarchically, with a "main task" (*i.e.*, a parent) starting multiple "sub-task[s]" (*i.e.*, children) for different actions. *Id.* at 21:13-16. By interacting with the parent "main task" window, users may access child "sub-task" windows for additional actions. *Id.*[26] A POSITA reading the specification would understand the claims to require an analogous hierarchy for pages. Forlines Decl. ¶¶ 77-78.

---

[26] While the patent lists some non-limiting examples of "primary" and "auxiliary" pages, it does not provide specific examples where the auxiliary page is identified as a "child" of the primary page. Ex. 8 at 46:46-56; *see also id.*, cl. 9.

49

Dr. Forlines further explains that "child" has a well-understood meaning in the field of user interface design—signifying that the "child" user interface (here, the "auxiliary page") is accessed through interaction with the "parent" user interface (the "primary page"). Forlines Decl. ¶¶ 67-75 (citing Ex. 30 (Fifth Edition of the Microsoft Computer Dictionary)). This ordinary meaning matches the specification's disclosures cited above.

Defendants' construction does not exclude embodiments in the specification. *Supra* at 47-48. The embodiments Multifold identifies involve only a "primary page" and an "ancillary page" ***where no parent/child relationship is specified***. *See* Ex. 8 at 25:25-30, 48:1-21, fig. 40; Forlines Decl. ¶ 90. Multifold cannot use these embodiments to broaden the claims, especially since (as explained above) (1) the "child" limitation was added as a narrowing amendment to secure allowance, and (2) the claims already expressly require an auxiliary page and a primary page. *See N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005) ("[T]he fact that claims do not cover certain embodiments disclosed in the patent is compelled when narrowing amendments are made in order to gain allowance over prior art."); *see also Mangosoft*, 525 F.3d at 1330-32.

Multifold's construction violates several key claim construction canons. *First*, as explained above, it effectively eliminates the term "child" from the claims. Forlines Decl. ¶¶ 83-84. *Second*, there is no support for Multifold's assertion that "child" equates to "secondary or ancillary." *Supra* at 47. The specification treats "secondary" and "ancillary" as synonymous with "auxiliary"—not "child."

*Finally*, Multifold's construction should be rejected because it would render the term indefinite. Multifold's construction offers no way for a POSITA to distinguish the "primary page" and "auxiliary page" with reasonable certainty. When presenting two pages from an application

on a device, it would not be possible to know whether the device is presenting a "primary" and an "auxiliary" page, or two "primary" pages, or two "auxiliary" pages, or some other classification of pages: Multifold's construction offers no objective criteria. *See* Forlines Decl. ¶¶ 91-94; *Meds. Co. v. Mylan, Inc.*, 853 F.3d 1296, 1303 (Fed. Cir. 2017). Likewise, it would not be possible for a POSITA to understand whether the limitation "wherein the [primary] page of the first application is displayed by one of the first display of the device and the second display of the device, and wherein the [auxiliary] page of the first application is not displayed" recited in claim 1 is met, because a POSITA would not know whether the displayed page was the "primary" or "auxiliary" page. Forlines Decl. ¶ 92.

### c.  Plaintiff's Reply Position

Defendants' claim construction analysis for this term misinterprets the intrinsic record, and elevates extrinsic evidence over intrinsic evidence contrary to the canons of claim construction.

First, Defendants' assertion that Multifold's construction ascribes no meaning to the term "child" is wrong. The first limitation of claim 1 requires "a first page of a first application . . . wherein the first page is an auxiliary page." The second limitation requires "a second page of the first application . . . wherein the second page is a primary page." Ex. 8 at Cl. 1. These two limitations alone say nothing regarding any relationship between the auxiliary page and the primary page, other than that they are part of the same application. The disputed claim term "wherein the auxiliary page is a child of the primary page" is the limitation setting forth the relationship between the auxiliary page and the primary page. And Multifold's proposed construction is aligned with the plain and ordinary meaning of the claim term in requiring that the

"auxiliary page is a secondary or ancillary page of the same application as the primary page."[27] Thus, contrary to Defendants' assertion, Multifold's construction does ascribe meaning to the term "child," and *Mangosoft* is therefore inapposite.  Similarly, because Multifold's construction sets forth the required relationship between the auxiliary page and the primary page, Defendants' indefiniteness arguments are meritless.  Ex. 20  at ¶¶ 57-59.

Defendants' argument boils down to an assertion that "auxiliary" page on its own is a synonym for a "secondary or ancillary" page, and thus a child page must be a specific subtype of secondary or ancillary page that can only be accessed through interaction with the primary page. But the specification belies Defendants' assertions, and instead supports that the claimed "child" page equates to a "secondary or ancillary" page.  For example, Defendants' analysis is premised on little more than an observation that the specification identifies an "auxiliary page 3710" in a disclosed embodiment.[28] But the patent describes an "auxiliary page" differently than a "secondary page," even if the specification has one instance where both have the same element number, "3710."  For example, in describing a maximization operation, the specification describes that "both the primary 3714 and the secondary 3710 pages are ***displayed as a result of*** the maximization operation." Ex. 8 at 48:42-51. Thus, secondary page 3710 is displayed ***after*** the maximization command.  But, the specification describes auxiliary page 3710 as already having been displayed with the maximization command was received.  *Id.* at 48:51-56 ("Moreover, the maximization

---

[27] At minimum, this construction makes clear that the auxiliary page is not a second primary page, a possibility that Dr. Forlines admits is a plausible manner for arranging two pages within the same application.  Ex. 31 at ¶ 93 ("[A] POSITA would need to be able to understand with reasonable certainty whether the application is displaying two primary pages . . . .").

[28] In fact, at his deposition, Dr. Forlines admitted that his analysis was simply based upon the number label associated with the auxiliary page, and not on any analysis of "the long series of interactions referencing a number of figures and state diagrams" describing the auxiliary page itself. Ex. 21 at 130:21-132:12.

command can result in the display of the primary page 3714 in a predetermined one of the first 104 and second 108 screens, without regard to whether doing so ***results in moving an auxiliary page 3710 displayed when the maximization command was received*** to a different screen 104 or 108.") (emphasis added).  Thus, auxiliary page 3710 is not synonymous with secondary page 3710. Instead, a POSITA would understand that the secondary page is a child page of the application. Ex. 20 at ¶ 56.

Defendants' analysis of the file history fares no better.  Defendants assert that "[t]he claims were allowed only after being amended to add the limitation 'wherein the auxiliary page is a child of the primary page.'" *Supra* at 49. But Defendants ignore that the relevant claim amendment leading to the notice of allowance also added ***other limitations*** to the claims.  The full amendment added requirements that "***wherein the first and second pages present different content and are distinct pages***, and wherein the auxiliary page is a child of the primary page." Ex. 27 at MULTIFOLD-G-0010051 (emphasis showing additional limitations unaddressed by Defendants). As explained by Dr. Surati, these additional limitations regarding the claimed first and second pages were meaningful because the Examiner's previous rejection over Lundqvist relied merely upon Lundqvist's disclosure that "a first portion of the image is displayed at the first display surface" and "a second portion of the image is displayed at the second display surface." Ex. 20 at ¶¶ 53-54. They were not distinct pages.  And, in any event, nothing in the prosecution history discusses restricting the manner in which the child page can be accessed.

Regarding the '884 provisional application, Defendants once again point to permissive, but not mandatory, examples of how child windows ***can*** be originated or launched.  However, nothing in these statements disclaim launching child windows without first "interacting" with a parent window, and thus Defendants' cited disclosures do not support their proposed construction.  *Supra*

53

at 48-49.[29] As explained by Dr. Surati, a POSITA would understand that just because a parent window launches a child window, that does not necessarily require "interaction with the primary page," as required by Defendants' proposed construction. Ex. 20 at ¶¶ 48-49, 52 (explaining how a parent window can launch a child window automatically depending on the state of the device or how the user interacts with the device).[30] Further belying Defendants' proposal, the '884 provisional application explicitly discusses examples where child windows are launched *without* requiring separate interaction with the parent window first. *See, e.g.*, Ex. 28 at MULTIFOLD-G-0015128 ("In an alternative embodiment, *the new application is displayed* in the Dual-Portrait (PD) output configuration or Dual-Landscape (LD) output configuration *but has a parent and child window opened*, where the parent window is displayed in a first touch sensitive display 110 and a child window is displayed in a second touch sensitive display 114."); *see also id.* ("In embodiments, window 9.1 742 is a parent window and window 9.2 746 is a child window. *A child window is a second window opened by an application that can provide further information to a user.* For example, when executing an email program. a parent window may display a list of message in an inbox. The child window may display the content of or information about one

---

[29] And even if Defendants were correct that these statements are somehow intended to be limiting with respect to the provisional application—which they are not—their deletion from the specification of the '494 Patent confirms that the '494 Patent should not be so limited. *MPHJ Tech. Invs., LLC v. Ricoh Ams. Corp.*, 847 F.3d 1363, 1369 (Fed. Cir. 2017). ("In this case, it is the deletion from the . . . [p]rovisional application that contributes understanding of the intended scope of the final application. We conclude that a person of skill in this field would deem the removal of these limiting clauses to be significant. The [asserted patent] in its final form contains no statement or suggestion of an intent to limit the claims to the deleted one-step operation.")

[30] Defendants' reliance on the specification's descriptions of "task[s]" and "sub-task[s]" (*supra* at 49) is similarly inapposite. Even accepting Defendants' logical leap that an application's tasks and sub-tasks can be analogized to parent pages and child pages—which is unfounded—the specification's disclosure that "[e]ach task can then start another task or sub-task to perform different actions" says nothing about requiring interaction with a task in order to access a sub-task.

particular message selected in the inbox.").  Defendants' construction is inconsistent with these disclosures, and would improperly exclude them, and thus should be rejected.[31]

### d. Defendants' Sur-Reply Position

Defendants' proposed construction is the only one that gives meaning to the word "child" and that is supported by the intrinsic evidence.

*First*, Defendants' construction establishes a clear relationship between the auxiliary page and primary page:  the auxiliary page is accessed through the primary page.  In contrast, Multifold's construction does not establish any relationship between the claimed auxiliary page and primary page.  It thus leaves the factfinder no way to know whether two given pages of an application are primary or auxiliary pages, which would render the term indefinite.  And the claims already specify that the auxiliary page and primary page are from the same application.  *Supra* at 48.  Multifold's proposed construction is circular, confusing, and should be rejected.  *See Harris*, 114 F.3d at 1152.

*Second*, Defendants' construction reflects the specification's interchangeable usage of "auxiliary," "secondary," and "ancillary," including by reference to the same numeral 3710 in the written description.  *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009).  The specification does not use "child" in the same way.  *Supra* at 48.  Multifold cites no intrinsic evidence that "the claimed 'child' page equates to a 'secondary or ancillary' page."  *Supra* at 52; *supra* at 51-55; *supra* at 47-48.  And when Multifold's expert was asked how the auxiliary

---

[31] Defendants' reliance upon extrinsic dictionary definitions cannot remedy the inconsistencies between the intrinsic record and Defendants' proposed construction.  Especially given that the dictionary definitions do not require interaction with the parent in order to access the child.  Ex. 20 at ¶¶ 47-50.

page and primary page are related under its construction, he replied by simply parroting the claim language "that one is a child of the other."  Ex. 32 at 188:18-23.

Multifold tries to distinguish "secondary" from "auxiliary" pages by arguing that secondary pages are "***displayed as a result of*** the maximization operation," while auxiliary pages are "***already . . . displayed*** with [sic] the maximization command was received."  *Supra* at 52-53 (second emphasis added).  But Multifold's construction requires that "the auxiliary page ***is a secondary or ancillary page***."  Multifold's reading of the specification renders its construction inoperable—a page cannot be both "already displayed" and "displayed as a result of" the same command.

***Third***, the significance of the term "child" added during prosecution is not diminished by the fact that other limitations were also added.  *Supra* at 53.  The Applicant represented that "the included amendments to the claims overcome the present rejection," Ex. 27 at MULTIFOLD-G-0010056, indicating that there was "a substantial reason related to patentability for including" ***all*** the added limitations.  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 33 (1997); *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 849 (Fed. Cir. 2006).

***Fourth***, Multifold's citations from the provisional application are consistent with Defendants' construction.  *Supra* at 53-54.  These portions suggest that the child window is opened ***after*** interaction (*e.g.*, selecting a message from an inbox) with the parent window.  Ex. 28 at MULTIFOLD-G-0015128, ¶ 107; *see also* Forlines Decl., ¶ 80.

***Fifth***, and finally, Multifold does not counter the evidence that Defendants' construction matches the well-understood meaning of "child" in the art.  *See supra* at 55 n.31.  Nothing in the intrinsic record gives "child" a different, non-standard definition.  *Supra* at 49-50.

### D.  DISPUTED TERMS FROM THE '050 PATENT

#### 1.    "In Focus"

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 8. | In focus | 050: 17 | "being active and/or selected to receive input" | "being active and selected for receiving input" |

#### a.  Plaintiff's Opening Position

The parties disagree regarding whether the component of a displayed graphical interface that is in focus must be both active and selected to receive input, as Defendants suggest, or as the patent instructs and Multifold proposes: the component be active and/or selected to receive input.

Multifold's construction is the definitional statement from the specification: "[t]he term 'focus' ***refers to*** being active and/or selected to receive input." (Ex. 5 at 5:50-51) (emphasis added); *Meds. Co.*, 853 F.3d at 1306 (finding 'refers to' to be definitional.) The specification further indicates that the phrase and/or is "both conjunctive and disjunctive in operation." And that "'A, B, and/or C' means A alone, B alone, C alone, A and B together, A and C together, B and C together, or A, B and C together." Ex. 5 at 2:41-48.

Applying the definitional language and specification guidance above, Defendants' construction: "active ***and*** selected for receiving input" is too narrow.  Defendants' proposed language is apparently drawn from the patent's discussion of only an exemplary embodiment, specifically as shown in FIGS.  7A-7C, where the patent states: "[a]s noted above, 'focus' means active and selected for receiving input." (Ex. 5 at 25:40-41).  Limiting a term to an embodiment like this is improper.  *See Liebel-Flarsheim*, 358 F.3d at 913 (Fed. Cir. 2004).

Moreover, the specification confirms that "active" and "selected for input" have different meanings.  For example, the patent specification describes certain graphical components as being

ME1 53150038v.1

"active" separate and apart from them necessarily being selected for input. (*See, e.g.*, Ex. 5 at 20:26-28, stating that "[o]nce the application becomes active again, the Task Management module 540 can again trigger the application to render its user interface;" *see also id.* at 23:64-67, stating that "an application's display preference may place the device into bilateral mode, in which both displays are active to display different windows in the same application", and *see also id.* at 25:65-66, stating that "[h]ighlighting 704 as noted above, indicates that screen 104 and display 110 are active."). Defendants' construction is overly narrow and Multifold respectfully requests that the Court adopt its construction, which is the *verbatim* definition provided in the patent's specification.

### b. Defendants' Answering Position

Claim 17—the sole asserted independent claim of the '050 patent—is directed to a "dual screen communication device." The device performs a method where a "first image of a first application" is displayed on a first display of a first screen, "wherein the first image is ***in focus***." Receiving an "input … indicating a request to launch a second application" results in "launching the second application; displaying, by the second application, a second image on [a] second touch sensitive display; and ***changing the focus*** from the first touch sensitive display to the second touch sensitive display." Ex. 5, cl. 17 (emphasis added).

The '050 patent defines "focus" twice in the specification. First, it states "the term 'focus' refers to being active and/or selected to receive input." Ex. 5 at 5:50-51. It later clarifies, referring back to this language, that "[a]s noted above, 'focus' means active ***and*** selected for receiving input." *Id.* at 25:40-41 (emphasis added). Contrary to Multifold's contention, *supra* at 57, this latter definition is not limited to "an exemplary embodiment." To the contrary, it clarifies "focus" ***in the context of*** the claims, which specifically address ***changing*** focus. Ex. 5 at 25:37-27:9, figs. 7A-7C. The clarified definition—that focus requires being "active ***and*** selected for input"— is the only construction consistent with its use in the specification and claims.

Every time the specification describes a change in "focus," "focus" requires something more than merely being "active." Figures 7A-7C (reproduced below) and their supporting disclosures demonstrate that changing focus requires changing both what is active and what is selected for input, as focus changes in response to user selection.



The patent explains that in Figure 7A, "screen 104 and display area 110 are **active and selected for input**. Highlight 704 provides an indication to a user that screen 104 and display area 110 have the focus." Ex. 5 at 25:40-45 (emphasis added). When "[t]he focus is … moved from screen 104 to screen 108," again "highlighting 704 provides an indication to a user of what … currently has the focus." *Id.* at 25:48-64. This is consistent in Figures 8A-8C and their supporting disclosures. *E.g.*, *id.* at 27:10-47 ("In FIG. 8A the focus is on screen 104, display 110, and image 804. Image 804 is in embodiments a window of **an active application which is selected to receive input from a user**." (emphasis added)). When, as here, "a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) (cleaned up).

Multifold's construction of "in focus" would allow any active application window to satisfy the "in focus" requirement, even if it has not been selected for input, which contradicts the claims. Multifold acknowledges that "the specification confirms that 'active' and 'selected for

input' have different meanings." *Supra* at 57-58. This distinction underscores why "in focus" must include both "active" and "selected to receive input." As Multifold itself notes, the patent describes a "bilateral mode" in which "both displays are active," *supra* at 57-58 (citing Ex. 5 at 23:64-67), and clarifies that "active" simply means "currently displayed," Ex. 5 at 18:34-37. Under Multifold's construction, determining which of two side-by-side windows/displays/images is "in focus" would be impossible, nullifying the limitation of shifting focus between displays in response to input.

### c. Plaintiff's Reply Position

Defendants readily admit that the '050 patent defines the term "in focus" as "being active and/or selected to receive input." *Supra* at 58 (citing Ex. 5 at 5:50-51). This definitional statement is Multifold's construction, and Defendants' admission should end the inquiry. But in an effort to salvage their construction, Defendants argue that twenty columns later in the '050 patent's specification, patentees further "clarif[y]" the definition as meaning active "and" selected for receiving input. *Supra* at 58 (citing Ex. 5 at 25:37-27:9; Figs. 7A-7C).

While Defendants couch this column 25 disclosure as a "clarification," Defendants are really arguing disclaimer or disavowal—that the disclosure in column 25 is indicative of patentees' intent to limit the claim term. As the Federal Circuit has repeatedly made clear, however, a limiting definition or a disclaimer, whether in the patent specification or in the prosecution history, "must be clear and unmistakable." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012). The column 25 disclosure does not clearly and unmistakably indicate an intent to disclaim any part of the definitional statement for "in focus."

Moreover, Defendants' construction does not make sense because it renders the words "being active" from its own construction superfluous. Defendants have identified no disclosure in the '050 patent of an image that is *not* active, but still selected to receive input. Put another way,

any image that is "selected to receive input," is necessarily "active." Therefore, if patentees truly intended for Defendants' interpretation to be the correct one, there is no reason for the patentees to have included the language "being active" as part of their definition.  Under Defendant's construction, this language is superfluous, confirming it is unlikely to be the correct one.

Lastly, Defendants argue that Multifold's construction is inconsistent with the claims because under Multifold's construction it cannot be determined which of two side-by-side windows is "in focus." *Supra* at 59-60. But Defendants' argument ignores the full language of claim, which describes through a series of wherein clauses the requirements for a first image to be "in focus" and the step of changing focus.  *See* Ex. 5 at Cl. 17. Based on the claim as a whole, and in particular the wherein clauses describing the changing of focus, Defendants' argument that Multifold's construction "nullif[ies] the limitation of shifting focus" is without merit.

### d.  Defendants' Sur-Reply Position

*First*, Multifold baselessly asserts that "Defendants are really arguing disclaimer or disavowal." *Supra* at 60.  Defendants have not invoked these doctrines.  Rather, Defendants' construction gives effect to "the specification as a whole," as the Federal Circuit requires. *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1347 (Fed. Cir. 2020).

*Second*, Multifold argues that Defendants' construction renders the words "being active" superfluous because an image that is "selected to receive input" is necessarily "active." *Supra* at 60-61.  Even if Multifold were correct—and it is not—the "selected to receive input" portion of Multifold's own construction would be just as superfluous.  If, as Multifold argues, an image "selected to receive input" is necessarily "active," then being "in focus" simply means "active."

*Third*, Multifold disagrees that its construction makes it impossible to determine which of two windows is "in focus." *Supra* at 61; *supra* at 59-60.  Multifold contends that "the full language of the claims" makes clear which window is in focus. *Supra* at 61.  But at the start of the claimed

61

method, a first image is already "in focus," before the focus is changed to a second display.  Ex. 5, cl. 17.  The later steps do not inform whether the "in focus" limitation is satisfied.

### 2. Configurable area

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 11. | Configurable area | 050: 17 | "an area capable of receiving input and has display or limited display capabilities" | "an area capable of receiving input and has display or limited display capabilities and is not part of the first or second display that provides content" |

### a. Plaintiff's Opening Position

The parties agree that the configurable area is "an area capable of receiving input and has display or limited display capabilities." However, Defendants' proposed construction is improper for further mandating that the configurable area "is not part of the first or second display that provides content." Here, claim 17 requires a first screen and a second screen, each with a touch sensitive display and a configurable area.  Ex. 5 at Cl. 17. While claim 17 allows for a particular screen's touch sensitive display and configurable area to be separate from one another, the claim does not require it, contrary to Defendants' proposed construction.  This is made clear upon review of dependent claim 19, which further limits claim 17 by requiring that "the first configurable area is separate from the first touch sensitive display and the second configurable area is separate from the second touch sensitive display." Ex. 5 at Cl. 19. Thus, under the doctrine of claim differentiation, the configurable area of claim 17 can be part of the first or second display that provides content, contrary to Defendants' proposal. *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999).

ME1 53150038v.1

The specification also supports Plaintiff's construction. For example, the specification explains that the configurable area has display capabilities. Ex. 5 at 10:64-67. Moreover, the specification is clear that the configurable area is part of a screen that provides "visual output" to a user,[32] and that a single display controller may provide for controlling all output functions of a single touchscreen (which would thus include the display and the configurable area). *See* Ex. 5 at 11:7-26. Defendants' proposed requirement that the display and the configurable area must be separate is inconsistent with these disclosures in the specification.

Defendants' construction appears to be premised upon a misapplication of a statement in the file history from U.S. Patent No. 9,792,007—a later-filed continuation of the '050 patent. There, in a February 16, 2017 Amendment, applicant both amended the then-pending claims and sought to distinguish the art cited by the examiner. In particular, applicant added a limitation which *is not present* in claim 17 of the '050 patent requiring that "wherein the first configurable area does not display content from an application, wherein the second configurable area does not display content from an application." Ex. 9 at MULTIFOLD-G-0008770-8773. And in accompanying remarks distinguishing the at-issue Rapp reference, applicant asserted "[t]he configurable area of the claim is not part of the display of content."[33] *Id.* at MULTIFOLD-G-0008768.

Defendants' reliance upon the file history of the '007 patent to construe the claim term "configurable area" for claim 17 of the '050 patent is mistaken. At a minimum, applicant's remarks distinguishing the Rapp reference are not relevant to the construction of "configurable

---

[32] *See also* Ex. 5 at 3:36-38 ("A screen can encompass any combination of gesture capture region, a touch sensitive display, and/or a configurable area.").

[33] For the purposes of this brief only, Multifold sets aside whether or not applicant's description of the Rapp reference is correct.

ME1 53150038v.1

area" for the '050 patent because those remarks were referencing a specific limitation of the '007 patent—*that is not present in the '050 patent claims*—requiring the first and second configurable areas to not display content from an application. *Id.* at MULTIFOLD-G-0008766-8768; *see Ventana Med. Sys., Inc. v. Biogenix Labs., Inc.*, 473 F.3d 1173, 1183-84 (Fed. Cir. 2006) (finding statements made during continued prosecution of a related patent regarding claim language not found in the ancestor patent to be irrelevant to claim construction of the ancestor patent). In any event, applicant adding a limitation to the '007 patent (and accompanying remarks) specifying that the configurable areas claimed therein did not display content from an application only supports that the plain and ordinary meaning of the term "configurable area" without such a limitation (as found in the '050 patent) encompasses a configurable area that is not separate from the display that provides content.

### b. Defendants' Answering Position

The asserted claims of the '050 patent recite a "dual screen communication device" that includes "a first touch sensitive display and a first configurable area of a first screen" and "a second touch sensitive display and a second configurable area of a second screen." Ex. 5, cls. 17, 20. The device performs a method in which "input options for [a] first application" "on the first touch sensitive display" are "displayed in the first configurable area," and "input is allowed from the first configurable area." *Id.* When the focus changes to a second application displayed on the second touch sensitive display, input options are no longer displayed in the first configurable area and input is no longer allowed there, but "input options for the second application are displayed in the second configurable area," and "input is allowed from the second configurable area." *Id.* The patent illustrates the "dual screen communication device" (100) and associated "configurable area[s]" (**112**, **116**) in Figures 1A and 1B, reproduced below:



FIG. 1A          FIG. 1B

"Configurable area" should be construed as "an area capable of receiving input and has display or limited display capabilities and is not part of the first or second display that provides content." This construction aligns with the claims, written description, and file history. Multifold's argument that the "configurable area" can be part of "the first or second display that provides content" directly conflicts with the specification and prosecution history.

*All* descriptions and examples in the specification regarding "configurable areas" refer to figures showing "configurable areas" (112, 116) as physically distinct from the displays (110, 114) on the screens (104, 108). For example, the patent explains that the "[p]rimary screen 104 also includes a configurable area 112 that has been configured for specific inputs" and the "[s]econdary screen 108 also includes a configurable area 116 that has been configured for specific inputs." Ex. 5 at 7:39–43. In various embodiments, the sub-areas of the configurable areas (112*a-c*, 116*a-c*) are configured to perform various functions (*e.g.*, "back," "menu," "home," or "other types of specific inputs including controlling features of device 100"), yet in *all* disclosed embodiments, the configurable area is separate from the display. *Id.* at figs. 1A, 1B, 7:43-62; *see also id.* at 10:64-11:7, 25:45-47, 26:24-26, 26:47-50. Again, "when a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *GPNE Corp.*, 830 F.3d at 1370 (cleaned up).

65

Ignoring all of the intrinsic evidence, Multifold attempts to extend the claims' scope far beyond the patent's disclosure.  For example, in its infringement contentions for the Accused Google Products, Multifold contends that a non-fixed menu associated with an application and overlaid on top of the application's display (red box in the image below) is the claimed "configurable area."  Ex. 29 at 16.



Multifold's strained interpretation not only deviates from the patent's written description, but also contradicts the Applicant's own remarks during prosecution of U.S. Patent 9,792,007 ("the '007 patent"), which shares a specification and priority claim with the '050 patent.  *See Microsoft Corp. v. Multi-Tech Sys., Inc*., 357 F.3d 1340, 1349 (Fed. Cir. 2004) ("[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application.").  There, the Examiner noted that a prior art reference, Rapp—unconsidered during the '050 patent prosecution—disclosed limitations similar to those of the '050 patent, requiring activating one configurable area and deactivating another in response to a change in focus.  Ex. 9, MULTIFOLD-G-0008727-728.  In response, the Applicant cited Figure 1B of the shared specification to argue: "***the configurable areas 112 and 116 … are not part of displays 11[0] and 114 that provide content.***  Thus, Rapp is describing a function and device that is ***completely different from what is claimed***."  Ex. 9, MULTIFOLD-G-0008767-68.

The Applicant distinguished the prior art as "completely different from what is claimed" precisely because the "configurable area" was "not part of [the] displays." *Id.* This argument informs the interpretation of this term in the '050 patent. *Microsoft*, 357 F.3d at 1349.

Multifold dismisses this history by noting that the Applicant amended the '007 patent claims (to overcome the Rapp rejection) to specify that the configurable areas do not display application content. Ex. 9, MULTIFOLD-G-0008770; *see supra* at 63-64. But Multifold cannot disregard the Applicant's statements during prosecution so easily. The Applicant referenced Figure 1B in the **specification**, not the claims, when stating that "the configurable areas 112 and 116 … are not part of displays 11[0] and 114 that provide content." Ex. 9, MULTIFOLD-G-0008768. Even Multifold's cited case acknowledges that "statements made by the inventor during continued prosecution of a related patent application can, in some circumstances, be relevant to claim construction," and that "statements made during the continued prosecution of a sibling application may inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Ventana*, 473 F.3d at 1184 (cleaned up); *see supra* at 63-64. Here, the Applicant's statements clearly inform the interpretation of this term.

Multifold also cites the doctrine of claim differentiation. But "claim differentiation is a rebuttable presumption that may be overcome by a contrary construction dictated by the written description or prosecution history." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016). Here, as described above, both the written description and the subsequent prosecution history overcome Multifold's argument.

In sum, Multifold cannot expand "configurable area" to include embodiments the Applicant clearly informed the Examiner were **excluded**. *See Microsoft*, 357 F.3d at 1349. The Examiner found—and the Applicant acquiesced to the finding—that claims directed to

67

configurable areas as part of the displays presenting content **were not** patentable over the prior art.

### c. Plaintiff's Reply Position

Defendants have not justified importing into the claims of the '050 patent a limitation that is not present—a requirement that a "configurable area" must be physically separate from the displays that provide content. As an initial matter, Defendants do not allege that the claims themselves mandate their construction. *Supra* at 64-65 (arguing only that Multifold's construction allegedly contradicts the specification and the file history). Nor could they—the claims merely recite "a first touch sensitive display and a first configurable area of a first screen" and "a second touch sensitive display and a second configurable area of a second screen." In order to prevail, Defendants must show the patentees either "clearly set forth a definition" of the terms that would exclude Multifold's construction, or a clear disavowal of claim scope. *Thorner*, 669 F.3d at 1365-1366. Defendants did not and cannot show either. Their proposal accordingly fails.

*First*, Defendants allege that because the only embodiments in the '050 patent show the configurable area as separate from the display, this is a claim requirement. This allegation misinterprets the specification and the law. As Multifold explained (*see supra* at 63-64), the '050 patent's specification does not require this rigid separation of the display and the configurable area. Instead, the patent discloses that the same liquid crystal device (LCD) and capacitive input matrix can be used for both a display area and a configurable area. Ex. 5 at 11:7-14. And the patent confirms that the configurable area "has display or limited display capabilities." *Id.* at 10:65-67. Regardless, limitations are not imported from embodiments in the specification, even if the only embodiments in the specification include them. *See Carucel Invs. L.P. v. Vidal,* No. 2021-1731, 2023 WL 8888644, at *5 (Fed. Cir. Dec. 26, 2023) ("[E]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively **unless the patentee has**

68

***demonstrated a clear intention to limit the claim scop***e using 'words or expressions of manifest exclusion or restriction.'") (internal citations omitted).

Defendants' alleged prosecution history disclaimer argument is also misplaced because it relies on arguments made in a subsequent, child patent application about different claims with claim limitations *not present* in the asserted claims. The claim-at-issue addressed by the patentees during prosecution of the '007 patent includes, in relevant part: "displaying a first image of a first application of a first application of a first display…wherein the first configurable area does not display content from an application, wherein the second configurable area does not display content from an application." Ex. 9 at MULTIFOLD-G-0008770. These "wherein" clauses are not recited in the asserted claims of the '050 patent, and it would be error to try to read it in. And notably in the '007 prosecution, patentees made clear that their argument was about this specific claim, and one specific embodiment in the patent (Fig. 1B), ***not*** the invention as a whole: "The configurable are of the claim is not part of the display of content. Indeed, ***the configurable areas 112 and 116 below*** are not part of the displays 11[0] and 114 that provide content. Thus, Rapp is describing a function and device that is completely different from what is claimed." *Id.* at MULTIFOLD-G-0008770. No "expression of manifest exclusion or restriction" exists for the '050 patent, and it would violate multiple canons of claim construction to read a limitation from one claim of the '007 patent into another claim from the '050 that does not recite it.

In their response, Defendants incompletely and selectively quote the above, leaving out words like "below," to suggest that the patentees were discussing the invention more generally and not only certain embodiments. *See supra* at 66-67. This is not surprising because Defendants' cited authority, *Microsoft Corp. v. Multi-Tech Sys., Inc.*, only allows statements in a later-filed child application's file history to apply to a parent if those statements are about the invention ***as a***

*whole*.  357 F.3d at 1349-50.  Here, the statements are about different claims with different limitations and therefore cannot apply to the '050 patent's asserted claims.  *See, e.g.*, *Sanofi v. Glenmark Pharms. Inc., USA*, 204 F.Supp.3d 665, 700 (D. Del. 2016, *aff'd sub nom. Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636 (Fed. Cir. 2017)) ("When the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply.").  As *Sanofi* explained, "[t]he sole exception is when the disclaimer is directed to the scope of the invention as a whole, not a particular claim." *Id.* (*quoting Regents of Univ. of Minn.*, 717 F.3d 943 n.8).

### d.  Defendants' Sur-Reply Position

Multifold's arguments for this term rest on an incorrect statement of the law.  Multifold argues that Defendants must show an express definition or clear disavowal.  *Supra* at 68-69.  But the Federal Circuit has rejected that approach, holding instead that claims must be read "in the context of the patent." *Symantec*, 811 F.3d at 1363.  Defendants have done exactly that.

In particular, the specification here "repeatedly, consistently, and exclusively" depicts configurable areas that are distinct from the displays, "manifesting the patentee's clear intent to so limit the term." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004); *supra* at 65.[34]  Thus, Multifold's reliance on *Carucel Invs. L.P. v. Vidal* is misplaced.  *Supra* at 68-69.  In *Carucel*, the rejected construction would have excluded an embodiment described in the specification.  2023 WL 8888644, at *5.  Not so here.

---

[34] Whether a configurable area and display may be part of the same **screen**—a different component of the disclosed embodiment—is irrelevant.  *See supra* at 65; *supra* at 68.  So too whether the configurable area has any display capabilities, *supra* at 68; the point is just that the configurable area is distinct from the claimed display that provides content.

The prosecution history of the related '007 patent adds further support. *See supra* at 66-67. Multifold argues that Defendants "selectively quote" this history "to suggest that the patentees were discussing the invention more generally." *Supra* at 69. But Defendants noted explicitly that the quoted language "cited Figure 1B of the shared specification." *Supra* at 66. And an Applicant's use of a claim term is informative regardless of whether it explicitly mentions the "whole" invention. *See MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1311-12 (Fed. Cir. 2017).[35] Here, there are no other embodiments in the specification related to "configurable areas," so the Applicant's statements necessarily relate to the invention as a whole. The prosecution history confirms Defendants' proposed construction.

### E. DISPUTED TERMS FROM THE '135 PATENT

#### 1. Pre-configured annunciator window

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 15. | Pre-configured annunciator window | 135: 3, 6 | "a window for displaying announcements (including, e.g., messages, alerts or other information) with an initial shape, size or location" | "window that spans across both the primary and secondary screens and displays status information about the device" |

#### a. Plaintiff's Opening Position

Defendants' proposed construction of "pre-configured annunciator window" ignores the claim language and improperly reads in limitations that are inconsistent with the plain and ordinary

---

[35] Multifold suggests that Defendants seek a finding of prosecution history disclaimer. *Supra* at 68-70. That is incorrect. Independent of disclaimer, "prosecution history can be evaluated to determine how a [POSITA] would understand a given claim term." *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021).

ME1 53150038v.1

meaning of the term.  The term "pre-configured annunciator window" appears in independent claims 1 and 6, which are directed to methods and instructions for a mobile "multi-display device." These claims refer to "displays" of the multi-display device, and do not include any limitations regarding "screens"—let alone limitations requiring a "primary" screen and a "secondary" screen. Ex. 6 at Cls. 1, 6.  Thus, Defendants' proposed construction of "pre-configured annunciator window" is improper in reading in limitations requiring a specific arrangement of screens.[36]

Second, Defendants' proposed construction incorrectly adds requirements regarding how the "pre-configured annunciator window" must appear that are inconsistent with both the plain and ordinary meaning of the term "pre-configured" as well as the surrounding claim language.  The term "pre-configured" simply means initially configured (and thus, the pre-configured window has an initial shape, size or location).  *See, e.g.*, Ex. 10 (defining "pre-configure" as "to configure (something) in advance").    Defendants' proposed requirement that the "pre-configured" annunciator window *must* "span across both the primary and secondary screens" merely describes a possible arrangement in which the annunciator window *can* be pre-configured.  However, it is certainly not required that all annunciator windows be pre-configured in such a manner.  That is made evident by the claim language, which in addition to the limitation describing displaying the "pre-configured" annunciator window, includes an additional limitation requiring "configur[ing] the annunciator window to extend across a first portion of the first display and a second portion of the second display." Ex. 6 at Cls. 1, 6. Thus, the claim language supports that the "pre-configured" annunciator window need not necessarily span across both displays.[37]

---

[36] Defendants' improper insertion of "screen" requirements into the independent claims of the '135 patent is described further below with respect to the term "open state."

[37] The specification also highlights this point by describing various device states and orientations, which can change the number of active displays and the physical arrangements of the displays with

Third, in requiring that the "pre-configured annunciator window" must display "status information about the device," Defendants' proposed construction is at odds with the claim language. According to the claims, the pre-configured annunciator window must have "information therein showing *at least one of* a device status, a connectivity status, and a messaging status." Ex. 6 at Cls. 1, 6. There is no justification for departing from this clear claim language, especially in view of the manner in which the specification describes the types of information the can be displayed in the annunciator window. Ex. 6 at 26:9-12 ("This annunciator window 1100 can serve many purposes to include the display of messages, alerts, statuses of the device, and other information."). Unlike Defendants' construction, Multifold's proposed construction is aligned with the specification in describing what the annunciator window displays.

### b. Defendants' Answering Position

The claimed "pre-configured annunciator window" has three requirements. The window must: (1) span across multiple screens; (2) display "status" information about the device; and (3) be "pre-configured" in both its display content and manner. The patent expressly supports Defendants' construction on all three points, as discussed below. Multifold's construction, in contrast, ignores these requirements and impermissibly tries to expand the scope of the claims.

### (i)    Spanning Multiple Screens

There can be no dispute that the patent limits the "present invention," as claimed in claim 1, to an annunciator window that spans across two screens. The specification explicitly states, "[i]n accordance with *the present invention*, an *annunciator* display or *window* is provided that *spans across both the primary and secondary screens*." Ex. 6 at 2:3-5 (emphasis added). This

---

respect to one another. *See,* Ex. 6 at Figs. 3A-B, 6A-J. Thus, several different output configurations could potentially serve as an initial configuration.

73

language underscores a fundamental aspect of the invention and therefore limits the scope of the claims. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (collecting cases); *see also Campbell Soup Co. v. Gamon Plus, Inc.*, No. 2020-2322, 2021 WL 3671366, at *4-5 (Fed. Cir. Aug. 19, 2021). As the patent explains, traditional dual display devices had a "very small area dedicated for annunciations" and "the actual annunciations themselves when displayed are difficult for a user to see due to their small size." Ex. 6 at 1:59-65. This led to misinterpretation by users because of the unfriendly format. *Id.* at 1:65-2:2. Therefore, "because of the increase in size of the annunciator window [across both screens], annunciations are better displayed." *Id.* at 2:5-7. Thus, in the "invention," each "annunciator window" embodiment in the specification spans multiple screens. *See, e.g.*, *id.*, figs. 7-8.

Multifold's sole argument against the clear requirement in the specification is that the claims refer to "displays" and not "screens." *Supra* at 71-72. While Multifold argues (incorporating its position on the "open state" term, discussed below) that the specification discloses that a single screen can include two displays, Multifold cannot identify any disclosure in the specification that a single screen can include the claimed "pre-configured annunciator window." This is because the patentee expressly limited the annunciator window—of the "present invention"—to a device with **two screens**. Multifold cannot ignore that clear disclosure now.

Multifold also cites dependent claims 3 and 9, which require a "first screen" and "second screen," to suggest that Defendants' construction "read[s] in a limitation from a dependent claim into an independent claim." *Infra* at 78-79. But those claims recite other requirements for the first

and second screen that are not part of Defendants' construction.[38]  Notably, Multifold does not argue that Defendants' construction is at odds with the limitations added by the dependent claims. Defendants' construction follows the express guidance of the intrinsic record.

### (ii)    Status Information

Defendants' construction also specifies that the annunciator window "displays status information about the device."  That should not be subject to dispute, as the claims themselves require that the annunciator window "show[] at least one of a device status, a connectivity status, and a messaging status," and that the display of the annunciator window is modified "in response to a changed state of at least one of the device status, connectivity status, and messaging status." Ex. 6, cl. 1.  Multifold argues that Defendants' construction "is at odds with the claim language," but does not explain why.  *Supra* at 73.  The "status information" of Defendants' proposed construction encompasses the status information identified in the claims.

### (iii)    Pre-Configured

Multifold's construction further specifies that the annunciator window has "an initial shape, size, or location."  This aspect also lacks any intrinsic support.  *See supra* at 71-73. Multifold's construction reads out the "configured" portion, allowing the annunciator window to meet the limitation simply by having a location.  This overlooks the specification's guidance, which highlights the ongoing functional state of the annunciator window rather than a single initial characteristic.  The patent explains that an annunciator can have different configurations to display different information, but as claimed, the annunciator window must be "pre-configured" with the

---

[38] Defendants' construction uses "primary" and "secondary" screen while the claims refer to a "first" and "second" screen.  Defendants' construction tracks the specification's express definition, but changing "primary" to "first" and "secondary" to "second" would not alter the meaning.

information it will display and its size and arrangement. *See, e.g.,* Ex. 6 at 26:7-15, 26:27-31 (noting a "preferred arrangement" of certain status notifications in the window).

### c. Plaintiff's Reply Position

Defendants' construction is unduly narrow for multiple reasons. First, Defendants readily admit that their construction imports two brand new limitations that are not found in the plain language of the asserted claims—a primary screen and a secondary screen. *Supra* at 73-74. The claims' plain language does not require multiple-screen devices. Instead, the claims are directed to a "multi-***display*** device," (*see, e.g.*, Ex. 6 at Cls. 1, 6) and the parties agree that one screen can include multiple displays. Moreover, other claims in the patents-in-suit expressly require a first and second "screen," terms the patentees chose ***not to use*** in the '135 patent, further confirming Defendants' construction is incorrect.

Defendants nevertheless allege the claims should be limited to two screens because the '135 patent specification allegedly disclaimed one-screen devices. As support, Defendants note one instance in the specification where the patentees use the term "present invention," disclosing "[i]n accordance with the present invention, an annunciator display or window is provided that spans across both the primary and secondary screens." *Supra* at 73 (quoting Ex. 6 at 2:3-5). But the Federal Circuit has cautioned that while the phrase the "present invention" *can* limit the ordinary meaning of claim terms, there must be a clear disclaimer or disavowal. *See, e.g.*, *Rambus Inc. v. Infineon Techs. Ag,* 318 F.3d 1081, 1094–95 (Fed. Cir. 2003). Here, Defendants present no evidence of clear and unmistakable disclaimer of single screen devices. And, as Multifold explained in its opening position (and ignored by Defendants), this construction directly contradicts the prosecution history, where the patentees expressly amended the claims to remove any "multi-screen device" requirements and replace them with the term "multi-display device." *See infra* at 79.

Even if the claim required two screens, Defendants' construction is still unduly narrow because it requires the window to be pre-configured to span both screens. As Multifold explained in its opening position, this is one way the window *can* be preconfigured, but it is not a requirement of the claims. *Supra* at 71-72. Similarly, Defendants have not identified any support for their allegation that "pre-configured" requires preconfiguring the window's shape, its size, and its location as opposed to a subset of those characteristics. *Supra* at 75-76.

Finally, Defendants' construction requires that the annunciator window "displays status information about the device." Defendants readily admit that the plain language of the claim requires that the annunciator window shows at least one of a device status, a connectivity status, and a messaging status. Defendants argue that the "status information" part of their construction "encompasses the status information identified in the claims." *Supra* at 75. If this were so, it is all the more reason why Defendants' construction is incorrect, because claims should be interpreted "with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441. F.3d 945, 950 (Fed. Cir. 2006). For all of these reasons, Defendants' improperly narrow construction should be rejected in favor of Multifold's plain meaning interpretation.

### d. Defendants' Sur-Reply Position

The phrase "preconfigured annunciator window" does not have a plain and ordinary meaning in the art, nor does Multifold contend otherwise. Multifold's cases are therefore inapplicable: Defendants need not show disclaimer or disavowal of the term's ordinary meaning, because there is no ordinary meaning. The ***only*** evidence, intrinsic or extrinsic, is an express definition from the patent that "***[i]n accordance with the present invention***, an annunciator window or display is provided that ***spans across both the primary and secondary screens***." Ex. 6 at 2:3-5 (emphasis added). A POSITA would understand that the patentee expressly defined the

term, and Multifold "cannot change or modify that definition [after prosecution]." *See In re Bass*, 314 F.3d 575, 577-78 (Fed. Cir. 2002).

## 2. Open state

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 14. | Open state | 135: 3, 6 | No construction necessary.<br><br>The claim defines the open state as the first display and second display facing in a same direction. | "when the primary screen and the secondary screen are generally on the same plane" |

### a. Plaintiff's Opening Position

As noted above, the asserted claims of the '135 patent relate to methods and instructions for a mobile "multi-display device." The claims define a state of the device as "an open state with [a]/[the] first display and [a]/[the] second display facing in a same direction." Ex. 6 at Cls. 1, 6. This claim language is clear and unmistakable, and thus does not require any further construction. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). The claimed "open state" has the first display and second display facing in a same direction.

Defendants' proposed construction improperly injects confusion by seeking to add limitations regarding the "open state" that are neither found in, nor contemplated by the claims. For example, the at-issue claims independent claims 1 and 6, where the term "open state" is found, simply requires a first display and a second display. These independent claims have no limitations regarding how many screens the multi-display device must have. However, Defendants' proposed construction reads a requirement into the independent claims which would require the multi-display device to have a "primary screen" and a "secondary screen." At most, dependent claims 3 and 9 add limitations requiring the first display to be on a first screen and the second display to be

78

on a different second screen.  Ex. 6 at Cls. 3, 9. But even still, contrary to Defendants' proposed construction, these dependent claims do not require one of the screens to be "primary" and the other screen to be "secondary." And in any event, it is improper to read in a limitation from a dependent claim into an independent claim, where the term "open state" appears.  *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012).  That is even more apparent upon consideration of dependent claims 2 and 8, which require "the first display and the second display are on a common first screen of the multi-display device." Ex. 6 at Cls. 2, 8.

Defendants appear to have taken their proposed construction by incorrectly reading in a requirement from an embodiment in the specification.  *See* Ex. 6 at 14:35-36. However, by adding a requirement that the multi-display device have primary and secondary screens, Defendants ignore other disclosures from the specification highlighting that more than one display can be located on a single screen.  Ex. 6 at 4:48-51. Nor have Defendants explained their insertion of a requirement that the primary screen and secondary screen be "generally on the same plane," when the claim defines the open state as having the first and second display "facing in a same direction."

Defendants' proposed construction is also inconsistent with the file history.  For example, on December 9, 2014, in the same amendment where applicant added to the pending claims the limitation requiring that a multi-display device be in an "open state," applicant also removed all references to a "multi-screen device" in the pending independent claims—replacing that term with the term "multi-display device." Ex. 11 at MULTIFOLD-G-0013386-13389. Thus, it is contrary to the file history for Defendants to reinsert a requirement for a primary and secondary screen via its proposed claim construction for "open state."

### b.  Defendants' Answering Position

The specification defines one of the possible device states as "the open state where the primary screen 104 and the secondary screen 108 are generally on the same plane." Ex. 6 at 14:35-

36.  This language not only defines but differentiates the "open state" from the other "twelve exemplary 'physical' states" of the device, each defined by the relationship between the primary and secondary screens or displays.  *Id.* at 13:52-14:55.  The "open state" is defined solely with respect to the screens.  *Id.* at 14:35-42.  This definition of "open state" controls the interpretation of the claims.  *Thorner*, 669 F.3d at 1365.  Defendants' proposal reflects this definition.

The Court should reject Multifold's proposals to leave the term unconstrued.  Not construing the term is improper because it lacks a single meaning, and a construction is necessary to resolve the parties' dispute.  *O2 Micro*, 521 F.3d at 1361.  "Open state" is defined in the specification and lacks a plain and ordinary meaning within or outside the '135 patent.  Multifold's reliance on claim language simply ignores the rest of the intrinsic record and the patent's clear definition.

As with the term "annunciator window," Multifold repeats here the same arguments regarding the first/second screen in Defendants' definition.  For the same reasons stated in that section, Multifold's arguments should be rejected.

### c.  Plaintiff's Reply Position

Again, Defendants' construction is incorrect because it imports into the claims of the '135 patent a requirement for a "primary screen" and a "second screen," without showing clear and unmistakable disavowal of single-screen devices.  *Supra* at 78-79.  Defendants' construction cannot be correct.  *See Thorner*, 669 F.3d at 1365-66.  Defendants nevertheless allege that failing to construe the term creates an *O2 Micro* problem.  But a Court is not required to construe every limitation in a patent, including if no explanation of the term is necessary to explain what the patentee covered by the claims.  *See O2 Micro*, 521 F.3d at 1362.  Here, "open state" needs no construction because its meaning is clear in light of surrounding claim language.  According to the asserted claim, in an open state, "a first display and a second display fac[e] in a same direction."

80

*See, e.g.*, Ex. 6 at Cl. 6. In their opposition, Defendants have not articulated any reason why this description of "open state" is insufficient for a fact finder to determine whether the patent is infringed. *Supra* at 79-80. And, again, Defendants have offered no justification for injecting into the claims the requirement of a "primary screen" and a "secondary screen," which their construction requires. The term need not be construed.

### d. Defendants' Sur-Reply Position

Multifold yet again tries to evade the patent's express definition of "open state." Multifold's reference to claim language that includes "displays" cannot override the definition that refers to physical "screens." Indeed, the fact that a device has two displays says nothing about the physical configuration of the device, to which the "open state" term is directed. Multifold's expert testified that a "display" could be a single pixel on a screen and that two displays could overlap with each other. Ex. 32 at 61:16-63:17, 211:9-213:5. But there is no way to define an "open state" in relation to a single pixel, or two overlapping displays. Therefore, Multifold has not overcome the presumption that the express definition governs, and "open state" is defined by the position of the two screens.

### 3. Degrade

| # in JCCC | Term | Claims | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 16. | Degrade | 135: 3, 6 | "reduce or lower the quality of" | "obscure a portion of the display that could display application information" |

### a. Plaintiff's Opening Position

Plaintiff's construction is consistent with the plain and ordinary meaning of degrade and degradation. *See* Ex. 12 (defining "degradation" as "[d]ecline in quality or performance…");

81

Ex. 13 (defining "degrade" as "to lower to an inferior or less effective level."). These definitions are consistent with the intrinsic record. *See, e.g.*, Ex. 6 at 26:57-59 ("The annunciated window can be provided without materially degrading the presentation of displayed information on the primary and secondary screens."). Defendants propose re-defining the term to "obscure" without justification. Obscure has a very different plain meaning than degrade. *See* Ex. 14 ("obscured data" is "data that has been distorted by cryptographic or other means to hide information"); Ex. 15 ("obscure" is "to make dark, dim, or indistinct" and "to conceal or hide by or as if by covering.").

The patent specification uses the terms differently and recites "degrading" (Ex. 6 at 26:57-59) and "obscure" ("The window may obscure the desktop." Ex. 6 at 6:1-2) in different contexts. And, if anything, the file history confirms that the terms have different meanings. For example, in a December 9, 2014 amendment, applicant added a limitation to the pending claims requiring that the annunciator not "degrade the display of information by the selected first and second desktops or applications." Ex. 11 at MULTIFOLD-G-0013386. In remarks accompanying the amendment, applicant described the Purcell reference as "teach[ing] away from the annunciator window of claim 1 because the window of the primary application of Purcell 'obscures images windows' of desktops and 'any other executing applications.'" *Id.* at MULTIFOLD-G-0013396. Applicant concluded, "[t]hus, the window of Purcell would degrade the display of information of all other desktops or applications, contrary to the requirements of claim 1." *Id*. Thus, the file history supports that while obscuring a window may be one way to degrade the display of information, the terms are not used interchangeably. And Defendants' construction is inconsistent with the file history for limiting the definition of "degrading" to only allow for "obscuring."[39]

---

[39] Defendants' proposal is also inconsistent with the claim language. The claim requires that the extended annunciator window "not degrade the display of information by the selected first and

ME1 53150038v.1

### b. Defendants' Answering Position

Defendants' construction is derived directly from the Applicant's arguments during prosecution and reflects the meaning of "degrade" within the claims and specification.  Multifold, on the other hand, broadens "degrade" to encompass a mere reduction in screen quality to resuscitate an abandoned infringement argument.

During prosecution, the Applicant explicitly defined "degrade" as "obscure" to avoid prior art.  Specifically, the Applicant contended that the Purcell reference "teaches away from" the claimed annunciator window because Purcell's primary application window "'obscures image windows' of desktops and 'any other executing applications.'  Thus, the window of Purcell would *degrade the display of information of all other desktops or applications, contrary to the requirements of claim 1*."  Ex. 11, MULTIFOLD-G-0013396 (emphasis added).  The Applicant was clear that "degrade" meant to obscure a portion of the display capable of showing information.

Ignoring this disclosure, Multifold relies primarily on extrinsic evidence, which is unnecessary given the intrinsic evidence directly addressing the issue.  *See Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2023).  Multifold's only attempt to address intrinsic evidence is an argument that obscuring a window is merely "one way to degrade the display of information."  That is incorrect for at least two reasons: first, the Applicant made no such distinction during prosecution; second, Multifold fails to explain how its definition of "reduce or lower the quality of" encompasses "obscuring," as required by the prosecution history.  Nor

---

second desktops or applications." Ex. 6 at Cl. 6. Defendants' proposal allows for degrading to occur when a portion of the display that ***"could"*** display application information is obscured. Thus, even if no application information is actually impacted, Defendants' proposal would still nonetheless allow for an obscuring of another portion of the display (without information on it) to qualify as the claimed "degrad[ing]."

83

could it, as Multifold argues that "[o]bscure has a very different meaning than degrade." *Supra* at 82. Accordingly, the Court should reject Multifold's meritless arguments.

### c.  Plaintiff's Reply Position

Defendants' position is flawed because it relies entirely on affirming the consequent—just because the patentees argued in the prosecution history that "obscuring" part of a screen's image degrades the display of information does not mean that to "obscure" is the same as, and the only way to "degrade." *See supra* at 83-84.  *See* Ex. 11 at MULTIFOLD-G-0013396 (wherein the patentees described Purcell's obscuring of information as an example of degrading).  The patentees did not expressly define "degrade" as "obscure."

Defendants argue that Multifold's construction is incorrect because Multifold has not explained how "reduce or lower the quality of" encompasses "obscuring." *Supra* at 83-84. This seems readily apparent, but, to be clear, under Multifold's construction, the claim reads "wherein the first and the second portion do not [reduce or lower the quality of] the display of information." Clearly, if some of the information is "obscured," the display of information is necessarily reduced or lowered in quality.  The definitions of "obscure" and "degrade" are very different—"degrade" has a much broader meaning.  In the context of the claims, the plain meaning of the term "degrade," as construed by Multifold, is consistent with the patentees' discussion of the Purcell reference and should be adopted.

### d.  Defendants' Sur-Reply Position

Here again, Multifold tries to side-step the patent's express definition.  Nothing in the patent refers to a "reduction in quality"—that comes only from Multifold's ***extrinsic evidence***. Instead, the specification describes how a window may "obscure the desktop" when it is displayed. Ex. 6 at 6:1-2.  This is consistent with the patentee's arguments to overcome prior art during prosecution.  *Supra* at 83.  The claims should be construed consistent with the patent's definition.

84

Dated: May 15, 2025

MCCARTER & ENGLISH, LLP

/s/ Alexandra M. Joyce
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Maliheh Zare (#7133)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com
mzare@mccarter.com

*Attorneys for Plaintiff Multifold
International Incorporated Pte. Ltd.*

RICHARDS, LAYTON & FINGER, PA

/s/ Kelly E. Farnan
Kelly E. Farnan (#4395)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendant
Motorola Mobility LLC*

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP

/s/ Cameron P. Clark
Brian P. Egan (#6227)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant Google LLC*

85